## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EDWARD SHAMOON, Derivatively and on Behalf of Nominal Defendant LANNETT COMPANY, INC., <br><br> Plaintiff, <br><br> v. <br><br> ARTHUR P. BEDROSIAN, MARTIN P. GALVAN, JOHN KOZLOWSKI, JEFFREY FARBER, DAVID DRABIK, PAUL TAVEIRA, JAMES M. MAHER, and ALBERT PAONESSA, III, <br><br> Defendants, <br><br> - and - <br><br> LANNETT COMPANY, INC., a Delaware Corporation, <br><br> Nominal Defendant. | Case No. 2:18-cv-03070-WB |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

REDACTED (PUBLIC) VERSION

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION ............................................................................1

II.   JURISDICTION AND VENUE ....................................................................8

III.  PARTIES ..........................................................................................................9

    A.   Plaintiff ...................................................................................................9

    B.   Nominal Defendant.................................................................................9

    C.   Individual Defendants..........................................................................10

IV.   DUTIES OF THE INDIVIDUAL DEFENDANTS ...................................12

    A.   The Fiduciary Duties of the Individual Defendants.............................12

    B.   Lannett's Corporate Governance Guidelines and Board Committee
        Charters Impose Additional Responsibilities on Its Officers and
        Directors...............................................................................................13

V.    SUBSTANTIVE ALLEGATIONS ..............................................................16

    A.   Regulatory Framework and the Generic Drug Market .........................16

    B.   Competition in the Generic Market Historically Has Led to Lower
        Prices....................................................................................................17

    C.   Lannett Adopted a Business Strategy Marked by Aggressive
        Acquisition of Products and Companies, Making Lannett's Ability to
        Generate Capital Imperative to its Survival.........................................19

    D.   Lannett Participated in a Widespread Illegal Scheme to Allocate
        Markets and Fix Prices for Generic Pharmaceuticals.........................20

        1.   Lannett Colluded to Fix the Price of Doxycycline Monohydrate...................23

        2.   Lannett Colluded to Fix the Price of Digoxin....................................24

        3.   Lannett Colluded to Fix the Price of Levothyroxine Sodium
            Tablets.......................................................................................26

        4.   Lannett Colluded to Fix the Price of Acetazolamide........................28

        5.   Lannett Colluded to Fix the Price of Ursodiol.................................29

VI.   THE COMPANY IS SUED FOR ITS MISCONDUCT BY PRIVATE
      PARTIES AND PUBLIC REGULATORS.....................................................32

A.  Lannett Becomes the Subject of an Intense Scrutiny by Federal and State Regulators ...................................................................................32

    1.  Congress Investigates the Causes for the Skyrocketing Prices of Generic Drugs ...........................................................................33

    2.  Forty State Attorneys General Bring Antitrust Suit Against Lannett, Alleging Industry-Wide Conspiracy to Fix Prices of Generic Drugs ...........................................................................35

    3.  DOJ Commences a Criminal Investigation into the Generic Drug Conspiracy ..............................................................................36

B.  Dozens of Private Lawsuits Are Filed Against Lannett, Alleging Antitrust Violations, Securities Fraud, and Consumer Protection Violations .................................................................................38

    1.  Lannett Is Sued in a Securities Fraud Class Action, Alleging that Lannett's Management Misled the Public Regarding its Revenue Source, Generic Competition, and Compliance with Laws and Regulations ...........................................................................38

    2.  Lannett Issues Additional Misleading Statements in its Proxy Statements ..............................................................................53

    3.  Dozens of Private Lawsuits Follow the Regulators' Investigation ...................57

VII.  ███████████████████████████ ...................................................................................58

A.  ███████████████████████████ ...................................................................................58

    1.  ███████████████████████████ ...................................................................................59

    2.  ███████████████████████████ ...................................................................................60

    3.  ███████████████████████████ ...................................................................................62

    4.  ███████████████████████████ ...................................................................................64

B.    █████████████████████████████████████

                        ................................................................64

VIII.  DAMAGES TO THE COMPANY ...............................................68

IX.  DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS .......................69

    A.  Demand on the Board Is Futile .................................................69

    B.  Demand on Defendants Farber, Maher, Taveira, and Drabik Is Futile Due to Their Insider Sales.................................................72

    C.  Demand on Defendants Maher, Drabik, and Taveira Is Futile Due to Their Positions on the Audit Committee ................................73

    D.  Demand on Drabik, Taveira, and Maher Is Futile Due to Their Positions on Governance and Nominating Committee.......................74

    E.  Demand on Farber, Drabik, and Paonessa III Is Futile Due to Their Positions on the Strategic and Planning Committee. ..................76

X.  INSIDER TRADING ALLEGATIONS ...........................................77

XI.  CAUSES OF ACTION ..........................................................80

XII.  PRAYER FOR RELIEF .........................................................85

XIII.  JURY DEMAND .................................................................86

Plaintiff Edward Shamoon ("Plaintiff"), by and through his undersigned counsel, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of Nominal Defendant Lannett Company, Inc. ("Lannett" or the "Company") against certain current and former members of Lannett's Board of Directors (the "Board") and certain Lannett executives for breaching their fiduciary duties.

Plaintiff makes these allegations upon personal knowledge, as to the facts of his ownership of Lannett stock, and upon the investigation of counsel, which included review and analysis of: (a) documents obtained pursuant to 8 *Del. C.* §220 (the "220 Documents"); (b) public filings made by Lannett, other parties, and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (c) press releases and other publically disseminated publications; (d) news articles, shareholder communications, and postings on Lannett's website concerning the Company's public statements; (e) the proceedings in a related securities class action, captioned *Utesch v. Lannett Co., Inc.*, No. 2:16-cv-05932-WB (E.D. Pa.) (the "Securities Action"); (f) the proceedings brought by the attorneys general of 40 states, captioned *Connecticut v. Aurobino Pharma USA, Inc.*, No. 3:16-cv-02056 (D. Conn.) (the "State AG Action"); (g) the antitrust class actions consolidated under the caption *In re. Generic Pharm. Pricing Antitrust Litig.*, No. 2:16-md-02724-CMR (E.D. Pa.) (the "Antitrust Action"); (h) the U.S. Department of Justice's ("DOJ") criminal investigation and indictments relating to the price fixing conspiracy (the "DOJ Probe"); and (i) other publicly available information concerning Lannett and the Individual Defendants (defined below).

## I.    NATURE OF THE ACTION

1.      This shareholder derivative action arises out of the Board's breach of their fiduciary duties in failing to diligently and disinterestedly serve Lannett. Specifically, the Individual Defendants knowingly caused Lannett to participate in an industry-wide price-fixing

conspiracy to attain its revenue goals and artificially inflate Lannett common stock in violation of state and federal law. Beginning some time in 2013 through the present (the "Relevant Period"), Lannett engaged in a business strategy based entirely on Lannett's ability to increase prices on its generic drugs by collusively entering into industry-wide anti-competitive agreements with other generic manufacturers. Ultimately, 25 state and federal regulators learned, through years-long investigations of the generic pharmaceutical industry, that Lannett participated in an industry-wide conspiracy to fix the prices of at least five of its generic drugs (including Doxycycline Monohydrate, Digoxin, Levothyroxine Sodium, Acerazolamide, and Ursodiol), consisting of a significant percentage of Lannett's overall business. Lannett executives effectuated this by participating at professional dinners and other business social events where industry executives met and shared competitive and highly confidential information with each other, including bids and pricing strategy. When the Individual Defendants were no longer able to conceal the Company's misconduct under the mounting regulatory scrutiny and private litigation, the Company was subjected to fines, legal costs, and severe reputational harm. As a result of the price-fixing, the Company is now defending against multiple regulatory inquiries and investigations, as well as private lawsuits, alleging securities fraud, consumer deception, and violations of state and federal antitrust law, causing Lannett great financial and reputational losses. Certain Individual Defendants also made nearly $10 million dollars in insider stock sales, capitalizing on Lannett's artificially inflated stock price before Lannett's illicit conduct was made plain, enriching themselves to the Company's and shareholders' detriment.

2. Lannett is a publicly traded company principally engaged in the manufacture, packaging, marketing, and distribution of generic medications for a wide range of therapeutic

2

areas. Lannett's 2017 fiscal year total net sales were in excess of $637 million, 53% of which was attributable to its top five products. Due to lower research and development and regulatory approval costs, generic drugs are normally cheaper than their brand-name counterparts. Generic drugs thus offer significant savings to consumers, payors, and the U.S. government.

3.      Since 2013, however, generic drugs have been experiencing a sudden and dramatic price increase without explanation. According to one study, "*[t]he prices of more than 1,200 generic medications increased on average of 448 percent between July 2013 and July 2014*[.]"[1]  [Emphasis added.]  This increase has piqued the interest of a number of state and federal regulators ·· including the DOJ, Congress, and dozens of state attorneys general – who began to scrutinize generic drug makers' pricing methodologies and the underlying causes for soaring generic prices.

4.      As regulators' inquiries eventually revealed, Lannett colluded in an industry-wide conspiracy amongst generic drug makers to fix the prices, and allocate territories for the sale, of at least 18 different generic medications in violation of state and federal antitrust laws and regulations. The illegal scheme included agreements to divvy up the market to maintain market share and inflate prices of generic drugs.

5.      On October 31, 2017, Lannett was named as a defendant in an antitrust enforcement action lead by the Connecticut Attorney General ("CTAG") (and later joined by 45 other states), which included allegations against 20 defendants relating to a total of 15 generic drugs. Furthermore, Lannett is the subject of an ongoing criminal investigation conducted by the DOJ, which concerns the same underlying wrongdoing that underlies the CTAG's complaint. In

---

[1]      Gillian Mohney, *Generic Drug Price Sticker Shock Prompts Probe by Congress*, ABC NEWS (Nov. 21, 2014, 10.45 AM ET), https://abcnews.go.com/Health/generic-drug-prices-skyrocketing-lawmakers-warn/story?id 27060992.

addition, more than 100 private antitrust lawsuits were filed against Lannett regarding its anti-competitive price-fixing agreements, which were consolidated into a multidistrict litigation.

6.     The Individual Defendants went out of their way to conceal their fraudulent conduct, offering a variety of benign justifications for the price increases, such as industry consolidation, plant closures mandated by the U.S. Food and Drug Administration ("FDA"), and/or elimination of unprofitable product lines.  The Individual Defendants have used an array of forums to spread these lies, including conference calls with analysts, industry conferences, press releases, and even regulatory disclosures.  Indeed, Lannett's regulatory filings with the SEC – including the Company's Proxy Statements – are replete with assurances of Lannett's compliance with applicable laws and regulations and the adequacy of its internal controls with respect to drug pricing methodologies and financial reporting.

7.     Consequently, and in addition to the private antitrust actions filed against the Company, Lannett was named as a defendant in a securities class action complaint, alleging Lannett made false and misleading statements in its regulatory disclosures relating to the Company's pricing methodologies and its internal controls with respect to drug pricing methodologies, in violation of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

8.     Lannett's Board breached their fiduciary duties to the Company by failing to take any corrective action, while knowing that the Company had entered into patently illegal price-fixing agreements, and then attempted to conceal this fact by providing false justifications for its collusive price increases.  ███████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████   Yet, the Board failed to take any steps to rectify Lannett's illicit business plan premised on anti-competitive price-fixing on the majority of the Company's generic drug products.

9.    For example, ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████

10.   Additionally, ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

11. ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

12. Critically, ██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

6

13. ███████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████

14. Notwithstanding ████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

7

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████   As a result of these

knowing failures to fulfill their fiduciary duties, the Board failed to mitigate the Company's

suffering great financial and reputational harm as a result of its blatant disregard of state and

federal antitrust laws.

15.     Instead of taking any action to remedy the ongoing violations of antitrust laws, the

Individual Defendants took advantage of, and actually benefitted from, the price-fixing by selling

their personally held common stock of Lannett before news of its illegal collusion became

public.  Specifically, Defendants, and Board members, Farber, Bedrosian, Drabik, Taveira, and

Maher sold a combined 240,000 shares for proceeds close to $10 million dollars.  Thus, a pre-

suit demand upon the Board is a useless and futile act, and Plaintiff rightfully brings this action

on Lannett's behalf.

## II.     JURISDICTION AND VENUE

16.     Jurisdiction lies pursuant to Article III, §2 of the United States Constitution at 28

U.S.C. §1331. The claims asserted herein arise under §§10(b), 14(a), and 29(b) of the Exchange

Act, 15 U.S.C. §§78j(b), 78n(a), 78t(a), and 78cc(b), and Rules 10b-5, 17 C.F.R. §240.10b-5,

and 14a-9, 17 C.F.R. §240.14a-9, promulgated thereunder.  This Court has supplemental

jurisdiction pursuant to 28 U.S.C. §1367, as to the state law claims alleged, as they arise out of

the same transactions and occurrences as the federal claims.  In connection with the wrongdoing

complained of herein, Defendants (defined below) used the means and instrumentalities of

interstate commerce, U.S. mail, and facilities of the national securities markets.

17.     This Court has personal jurisdiction over each of the Defendants named herein

because each Defendant is either a corporation incorporated, maintaining its principal executive

offices, and operating in this District, or is an individual who maintains a place of business in this District or has sufficient minimum contacts with this District, so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Further, the Individual Defendants conducted much of the wrongdoing complained of herein in this District.

18.     Venue is proper in this jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1391(b).  Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because: (i) Lannett is headquartered in, and therefore is a resident of, the State of Pennsylvania; (ii) one or more of the Individual Defendants either resides or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein in violation of fiduciary duties owed to Lannett and its shareholders, occurred in this District; and (iv) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III.     PARTIES

### A.     Plaintiff

19.     Plaintiff Edward Shamoon is a current shareholder of Lannett, has continuously held Lannett stock, and is committed to retaining Lannett shares throughout the pendency of this action to preserve his standing.  Plaintiff will adequately and fairly represent the interests of Lannett and its shareholders in enforcing his rights.

### B.     Nominal Defendant

20.     Nominal Defendant Lannett is a Delaware corporation with its principal place of business located at 9000 State Road, Philadelphia, Pennsylvania 19136.  Lannett manufactures,

packages, markets, and distributes generic medications, including solid oral (tablets and capsules), extended release, topical, nasal, and oral solutions finished dosage forms of drugs, for a wide range of therapeutic areas.  Lannett's total net sales for fiscal year 2017 were $637.3 million, 53% of which was attributable to its top five products.[2]

### C.   Individual Defendants

21.     Defendant Bedrosian has served as the Company's Chief Executive Officer ("CEO") from January 2006 to January 2018 and as its President from May 2002 to December 2014.  Prior to becoming the President, Defendant Bedrosian served as Lannett's Vice President of Business Development from January 2002 to April 2002 and as a director from February 2000 to January 2002.  Defendant Bedrosian was reelected as a director in January 2006.  Defendant Bedrosian resigned from Lannett as its CEO in September 2017.  In 2012, Defendant Bedrosian assumed the role of Chairman of the Strategic Planning Committee, which he joined in 2008. During the Relevant Period, Defendant Bedrosian signed the Company's annual and quarterly Form 10-Ks and 10-Qs, including the Company's Sarbanes-Oxley Act of 2002 ("SOX") certifications.  Defendant Bedrosian played an instrumental role in the events and circumstances giving rise to this lawsuit, as described in detail herein.

22.     Defendant Galvan was appointed Lannett's Vice President of Finance, Chief Financial Officer ("CFO"), and Treasurer in August 2011.  During the Relevant Period, Defendant Galvan signed the Company's annual and quarterly Form 10-Ks and 10-Qs, including the Company's SOX certifications.

23.     Defendant John Kozlowski ("Kozlowski") has been Corporate Chief Operating Officer of Lannett since October 2017.  As such, Defendant Kozlowski was responsible for directing Lannett's accounting activities to ensure accurate and timely compliance with all

---

[2]     *See* Lannett Co., Inc , Ex. 99.1 to Current Report (Form 8-K) (Aug. 25, 2017).

internal controls.  Defendant Kozlowski served as the Vice President of Financial Operations and Corporate Controller of Lannett from July 2016 to October 2017 and from 2009 to October 26, 2017, respectively.  Defendant Kozlowski joined Lannett in 2009.

24.     Defendant Farber has served as the Company's Chairman of the Board since 2011 and as a Board director and member of the Strategic Planning Committee since 2006.  Prior to that, Defendant Farber served as the Company's Secretary from August 2003.

25.     Defendant Drabik was elected to the Company's Board in January 2011.  At all times relevant hereto, Defendant Drabik served as a member of the Audit Committee, Compensation Committee, and Strategic Planning Committee and as the Chairman of the Governance and Nominating Committee.

26.     Defendant Taveira was appointed to the Company's Board in July 2015.  At all times relevant hereto, Defendant Taveira served as a member of the Audit Committee and Governance and Nominating Committee and as the Chairman of the Compensation Committee.

27.     Defendant Maher was appointed to the Company's Board in June 2013. Defendant Maher also served as the Chairman and financial expert of the Audit Committee and as a member of the Compensation Committee and Governance and Nominating Committee.

28.     Defendant Albert Paonessa, III ("Paonessa") was appointed to the Company's Board in July 2015.  Defendant Paonessa also served as a member of the Compensation Committee and Governance and Nominating Committee.

29.     Defendants Bedrosian, Galvan, Kozlowski, Farber, Drabik, Taveira, Maher, Paonessa are collectively referred to herein as the "Individual Defendants."

30.     Defendants Farber, Drabik, Taveira, Maher, and Paonessa are collectively referred to herein as the "Director Defendants."

31.     Defendants Farber, Taveira, Drabik, Maher, and Bedrosian are collectively referred to herein as the "Insider Trading Defendants."

32.     Lannett, the Individual Defendants, Director Defendants, and Insider Trading Defendants are collectively referred to herein as the "Defendants."

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.     The Fiduciary Duties of the Individual Defendants

33.     By reason of their positions as past or present officers and/or directors, and by virtue of their ability to control the business and corporate affairs of Lannett, each Individual Defendant owed, and owes, Lannett and its shareholders fiduciary obligations of trust, loyalty, good faith, and candor and were, and are, required to use their utmost ability to control and manage the Company in a lawful, fair, just, honest, and equitable manner.  The Individual Defendants were, and are, required to act in furtherance of the best interests of Lannett and its shareholders, so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

34.     Each Individual Defendant owes to Lannett and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company, the use and preservation of its property and assets, and the highest obligations of fair dealing.

35.     At all times relevant hereto, each Individual Defendant was the agent of each of the other Individual Defendants and of the Company and was, at all times, acting within the course and scope of such agency.

36.     By virtue of their fiduciary duties of loyalty, good faith, trust, and candor, each Individual Defendant was required to, among other things:

> a.     exercise good faith to ensure that Lannett's affairs were conducted in an efficient, business-like manner;

12

b.  exercise good faith to ensure that the Company operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, requirements, and contractual obligations, including acting only within the scope of its legal authority;

c.  when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence; and

d.  remain informed as to how the Company conducted its operations and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith.

**B.  Lannett's Corporate Governance Guidelines and Board Committee Charters Impose Additional Responsibilities on Its Officers and Directors**

37.  Lannett's Corporate Governance Guidelines charge the Board with, *inter alia,* the "oversight of the Company's business and affairs" and "monitor[ing of] the operating performance and financial condition of the Company[.]"[3]  Notably, the Company's Governance Guidelines specifically charge the Board with the responsibility of "reviewing the major risks facing the Company and helping develop strategies to address these risks, and establishing policies designed to maintain the financial, legal and ethical integrity of the Company."

38.  Moreover, every director and officer of Lannett was, and is, required to comply with the Company's Code of Business Conduct and Ethics, which mandates fair dealing with the Company's customers, suppliers, competitors, and employees and expressly prohibits the "tak[ing of] unfair advantage of anyone through manipulation, concealment, abuse or privileged information, misrepresentation of material facts, or any other unfair-dealing practice."[4]  Indeed, the Company's Ethics Code obligates all employees to "report violations of laws, rules, regulations or the [Ethics] Code to appropriate personnel."

---

[3]      Lannett Co., Inc., *Corporate Governance Guidelines* (June 19, 2017), http://lannett.investorroom.com/corporate-governance (the "Governance Guidelines")

[4]      Lannett Co., Inc., *Lannett Code of Business Conduct and Ethics* (June 14, 2013), http://lannett.investorroom.com/corporate-governance (the "Ethics Code")

13

39.     The charters of Lannett's four standing committees provide additional obligations and responsibilities of Lannett's Board members.   For example, according to the Audit Committee Charter, the Audit Committee was established for the purpose of assisting the Board's oversight of the:

> Conformity, in all material respects, of the Company's financial statements filed with the SEC, with generally accepted accounting principles
> - Company's systems of internal control over financial reporting
> - Company's processes for monitoring compliance with legal and regulatory requirements
> - Independent Auditor's qualifications, compensation, performance, results and independence
> - Performance and results of the Company's internal audit function[5]

40.     Accordingly, to carry out this purpose, the Audit Committee members are expressly charged with responsibilities relating to the proper administration of internal audits. For example, the Audit Committee members are obligated to: "receive and review . . . the Company's financial statements prior to the[ir] filing," including a discussion of critical accounting policies and any financial reporting matters which could have a material impact on the Company's financial statements.

41.     Critically, the Audit Committee was also charged with reviewing the Company's earnings press releases, as well as financial information and earnings guidance to be provided to analysts and other third parties.   The Audit Committee was also obligated to make its own assessments and come to its own conclusions regarding the Company's internal controls over financial reporting, including evaluating the need for enhancements.

42.     The Audit Charter also specifies the following further obligations:

- "discuss the Company's significant enterprise risks and the procedures Management has developed to monitor, manage and mitigate such exposures";

---

[5]     Lannett Co., Inc., *Lannett Audit Committee Charter* (Apr. 23, 2014), http://lannett.investorroom.com/ committee-charters (the "Audit Charter").

- "periodically review Management's processes for monitoring compliance with legal and regulatory requirements"; and

- "review with Management and legal counsel any significant legal or compliance matters, including the status of pending litigation that may have a material impact on the Company and any material reports or inquiries from regulatory or governmental agencies."

43.    Lannett also maintains a Governance and Nominating Committee to "[d]evelop[] and recommend[] to the Board the corporate governance guidelines."[6]

44.    Finally, Lannett involved the Board directly in setting the Company's overall business strategy through a Strategic Planning Committee that is responsible for assisting the Board in:

- Overseeing the implementation of the strategic [business] plan and related initiatives
- Identifying and evaluating corporate development opportunities
- Developing criteria for use in evaluating potential strategic investments
- *Assisting management to identify critical strategic issues facing the organization*[7]

[Emphasis added.]

45.    To carry out its purpose, members of the Strategic Planning Committee were charged with "identif[ying] specific long-term goals and business objectives determined to be in the Company's best interest." The Strategic Planning Committee thus took on a quasi-managerial function, "*evaluat[ing] the progress and effectiveness of the strategic plan, recommend[ing] changes to the plan where necessary or advisable* and evaluat[ing] other issues or opportunities." [Emphasis added.]

---

[6]    Lannett Co., Inc., *Lannett Governance and Nominating Committee Charter* (June 14, 2013), http://lannett. investorroom.com/committee-charters (the "G&N Charter")

[7]    Lannett Co., Inc., *Lannett Strategic Planning Committee Charter* (Jan. 2015), http://lannett.investor room.com/committee-charters (the "Strategic Planning Charter").

## V.   SUBSTANTIVE ALLEGATIONS

### A.   Regulatory Framework and the Generic Drug Market

46.     A generic drug is a medication created to be the same as an existing approved brand-name drug in dosage form, safety, strength, route of administration, quality, and performance characteristics.[8]  Generic medications work in the same way and provide the same clinical benefits as their brand-name versions.

47.     All pharmaceutical drugs marketed in the United States – whether brand name or generic – must be approved by the FDA.  The Federal Food, Drug, and Cosmetic Act ("FD&C Act"), as amended by the Hatch-Waxman Act, establishes the regulatory framework.  Typically, to obtain the FDA's approval to market a brand-name drug, manufacturers must file for a New Drug Application ("NDA"), which requires them to undergo a rigorous and multi-phased sequence of clinical tests and analyses aimed at demonstrating the drug's safety and efficacy. From the standpoint of a pharmaceutical company, the NDA process is a lengthy and financially cumbersome endeavor.

48.     New brand-name drugs are usually protected by patents issued by the U.S. Patent and Trademark Office that prohibit others from selling generic versions of the same drug, thereby allowing brand manufacturers a certain limited period of exclusivity to recoup the financial resources they invested in the development of the new brand-name medication.

49.     To encourage competition, Congress eliminated the requirement that generic drug makers file an NDA application.  Instead, companies wishing to sell a generic drug obtain the FDA's approval through an Abbreviated New Drug Application ("ANDA").  An ANDA relies on clinical data first submitted by the brand-name drug manufacturer to establish safety and

---

[8]     U.S. Food & Drug Admin., *Generic Drug Facts* (June 4, 2018), https://www.fda.gov/Drugs/ResourcesFor You/Consumers/BuyingUsingMedicineSafely/GenericDrugs/ucm167991.htm

efficacy, requiring only that the generic product demonstrate "bioequivalency" to the brand-name drug. As a result of the FDA's bioequivalence requirement, generic drugs work in the same way and provide the same clinical benefits as brand-name versions.[9]

50. Lower upfront research costs present a lower barrier to entry for generic drug makers to enter the market for bioequivalent drugs, increasing competition and resulting in lower prices for consumers once the brand-name exclusivity period has ended. Following the federal government's 1984 enactment of the Hatch-Waxman Act, all 50 states and the District of Columbia have adopted either mandatory or permissive generic substitution laws that allow generic versions to be liberally substituted for their brand name counterparts.[10]

**B.      Competition in the Generic Market Historically Has Led to Lower Prices**

51. When multiple generic drug companies market a bioequivalent product, market competition typically results in generic prices being about 85% less than the brand-name. The appearance of a second generic manufacturer reduces the average generic price to nearly half the brand-name price.[11] Generic prices eventually reach as low as 10% to 20%, if not lower, of the pre-generic entry brand name price when an equilibrium, or market-clearing, price point is finally reached.[12] The FDA's analysis of the IMS Health retail sales data for single-ingredient brand-name and generic drug products sold in the U.S. from 1999 through 2004 confirms that the entry of generic makers will cause drug prices to predictably fall:[13]

---

[9]      *Id.*

[10]      Jessica S. Mazer, Esq., *Generic Substitution The Science and Savings. D C Governors' Staff Briefing*, PHARM. CARE MGMT. ASS'N (Mar. 9, 2011), http://www.amcp.org/WorkArea/DownloadAsset.aspx?id=10530.

[11]      Dr. Henry J. Kahwaty, Ph.D., *Generic Substitution The Savings*, BERKELEY RESEARCH GRP. (Mar. 9, 2011), http://amcp.org/WorkArea/DownloadAsset.aspx?id=10532.

[12]      *Why Are Some Generic Drugs Skyrocketing in Price? Hearing Before the S Comm on Health, Educ, Labor and Pensions (HELP)*, 113th Cong. (2014) (statement of Stephen W. Schondelmeyer, BS Pharm, MA Pub Adm, Pharm.D., Ph.D., FAPhA), https://www.help.senate.gov/imo/media/doc/Schondelmeyer.pdf ("Schondelmeyer Statement")

[13]      Kahwaty, *Generic Substitution The Savings*, *supra* n.11



**Generic Competition and Drug Prices**

Source: FDA analysis of retail sales data from IMS Health, IMS National Sales Perspective (TM), 1999-2004, extracted February 2005

52.     Due to the fact that generic versions are fungible, and therefore, easily substitutable for one another, generic products behave like commodities and are marketed primarily on the basis of price.[14]

53.     As a result of the substantially lesser price charged for generic drugs, prescriptions for generic drugs have increased while those for brand-name drugs have declined.[15] According to a report prepared by the IMS Institute for Healthcare Informatics, generic drug prescribing reached an all-time high of $254 billion in 2014, with savings during the last ten years amounting to $1.68 trillion.[16]

54.     Since 2013, however, generic drugs have been experiencing a sudden and dramatic price increase without explanation. According to reports cited during congressional hearings relating to the prices of generic drugs, "*[t]he prices of more than 1,200 generic*

---

[14]     *See, e.g.,* FTC, *Authorized Generic Drugs  Short-Term Effects and Long-Term Impact* at 17 (Aug. 2011), https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf.

[15]     *See* U.S. Dep't of Health & Human Servs., Office of the Ass't Sec' for Plan. & Eval., *Observations on Trends in Prescription Drug Spending* (Mar. 8, 2016), https://aspe.hhs.gov/sites/default/files/pdf/187586/Drugspending.pdf.

[16]     Generic Pharm. Ass'n, *Generic Drug Savings in the U.S  Seventh Annual Edition  2015* (Apr. 27, 2016), http://www.gphaonline.org/media/wysiwyg/PDF/GPhA  Savings  Report  2015.pdf.

*medications increased an average of 448 percent between July 2013 and July 2014*[.]"[17]
[Emphasis added.]  According to the National Community Pharmacists Association ("NCPA"), a
2013 member survey showed that pharmacists across the county "have seen huge upswings in
generic drug prices that are hurting patients and pharmacies ability to operate" and "77% of
pharmacists reported 26 or more instances over the past six months of a large upswing in a
generic drug's acquisition price" (with prices spiking by 600% to 2,000% in some cases).  More
than $500 million of Medicaid drug reimbursement during the 12-months ending on June 30,
2014 was for generic drugs whose price had increased by over 100%.[18]

## C.  Lannett Adopted a Business Strategy Marked by Aggressive Acquisition of Products and Companies, Making Lannett's Ability to Generate Capital Imperative to its Survival

55.     Prior to Lannett's participation in the price fixing conspiracy, the Company's
financial health and performance was stagnating, with net sales ranging from $42 million to $125
million between 2005 and 2012.  Indeed, in November 2013, analysts regarded Lannett as
"below average" company with the outlook to "underperform the market."[19]

56.     In an attempt to reverse Lannett's course, then-CEO Defendant Bedrosian – who
joined Lannett in 2000 – adopted a growth strategy marked by the aggressive acquisition of
products and companies. This strategy was aimed at increasing Lannett's resources and size, so
that it could challenge existing drug patents, and then later develop a vertically-integrated
business segment within the controlled substance division – a much more lucrative segment of
the pharmaceutical industry.  Thus, Defendant Bedrosian envisioned the growth strategy to be

---

[17]     Mohney, *Generic Drug Price Sticker Shock Promotes Probe by Congress, supra* n.1.

[18]     State AG Action, Amended Complaint ¶66 (E.D. Pa. Mar. 1, 2017) (ECF No. 168) ("State AG Complaint").

[19]     SADIF Inv. Analytics, S.A., *Will Lannett, Company Inc Burn Out Over the Long Term* (Nov 18, 2013).

Lannett's path to tap into the multi-million dollar opioid space while enjoying patent protections for its vertically integrated products.

57. Defendant Bedrosian quickly moved to execute on its growth strategy. Between 2013 and 2015, Lannett acquired a number of companies and products, including: (i) Jerome Stevens Pharmaceuticals, Inc. ("JSP") whereby Lannett gained the exclusive right to distribute three of JSP's products, including Digoxin tablets and Levothyroxine; (ii) Silarx Pharmaceuticals, Inc. ("Silarx") - a manufacturer of liquid generic pharmaceutical products that allowed Lannett to expand its product offering and production capacity; and (iii) Kremers Urban Pharmaceutical Inc. ("Kremers") – a specialty generic drug manufacturer and developer of generic versions of pharmaceutical products whereby Lannett acquired the right to sell an additional 18 drugs and diversify its business mix away from its key products.

58. Defendant Bedrosian's acquisition strategy required significant capital resources, which Lannett did not possess. Thus, to finance its acquisition appetite, Lannett took on a large amount of debt. Between the years 2013 and 2015, Lannett spent over $1 billion in cash, stock, and warrants to acquire other products and companies. In fact, during the course of these acquisitions, Lannett entered into the largest credit facility in the Company's history. Consequently, it became imperative that Lannett improve its sales and revenue to secure sufficient capital to finance its debt obligations and prevent the breach of its debt covenants. Lannett secured the needed capital by entering into a widespread conspiracy to fix prices on generic drugs, as described herein.

## D.    Lannett Participated in a Widespread Illegal Scheme to Allocate Markets and Fix Prices for Generic Pharmaceuticals

59. To execute on its growth strategy, Lannett engaged in an illegal conspiracy to fix generic drug prices. Lannett, along with other generic manufacturers, participated in a

20

widespread illegal scheme, including entry into numerous contracts, combinations, and conspiracies, with the goal of divvying up the generic drug market amongst themselves. The goal of the conspiracy was to allow Lannett and its competitors, through collusion, to maintain their market share and inflate the prices of generic drugs. This conduct had the effect of unreasonably restraining trade, artificially inflating and maintaining prices, and reducing competition in the generic pharmaceutical industry throughout the United States and across dozens of generic drugs.

60.     Lannett's role in the industry-wide conspiracy became known via court filings. The inner workings of the anticompetitive conduct – including Lannett's participation in the industry-wide conspiracy committed with the goal of avoiding price erosion and maintaining inflated pricing for targeted products – was exposed through the proposed amended complaint filed by 46 state attorneys general in October 2017,[20] stating, amongst other things:

a.  The conspirators, including Lannett, frequently interacted and communicated at industry tradeshows, business dinners, and other social events in a variety of locations throughout the United States, during which time they discussed and shared competitively sensitive information concerning upcoming bids, specific generic drug markets, pricing strategies, and pricing terms in their customer contracts. Proposed AG Complaint ¶¶78-79;

b.  Between February 20, 2013 and December 20, 2013 alone, there were at least 44 different tradeshows or trade conferences, giving conspirators ample opportunity to meet in-person. *Id.* ¶91;

c.  The industry participants commonly understood and agreed that each of them is entitled to a certain portion of the market, with a potential adjustment based on the timing of their entry onto the market. *Id.* ¶¶90-91;

d.  Industry participants used phone calls and text messages to discuss fair share and the desire to maintain or raise prices with respect to specific drugs. *Id.* ¶93;

---

[20]     *See* Antitrust Action, Plaintiffs' [Proposed] Consolidated Amended Complaint (E.D. Pa. Oct. 2017), https://dlbjbjzgnk95t.cloudfront.net/0980000/980102/amended%20complaint.pdf (the "Proposed AG Complaint").

e. The conspirators actively monitored and discussed with each other participants' shares in the context of specific drugs, which discussions were initiated with the expectation that an agreement on market share would be reached. *Id.* ¶97;

f. There was a common understanding amongst the conspirators that the market share could be adjusted. To allow a conspirator to obtain greater market share by acquiring a customer, the conspirator's competitor would forgo that customer by informing him/her of a significant price increase. The manufacturer looking to increase his/her market share would then submit supra-competitive bid at an amount slightly below the original competitor's to win that customer's business. *Id.* ¶99;

g. The conspirators colluded: they understood and agreed that none of them would seek to compete or undermine the competitor's price increase by bidding a lower price to win the customer's business. *Id.* ¶106; and

h. The conspirators frequently shared with each other bids and pricing strategy, including bid packages received from a customer, as well as the terms of their contracts with customers, including pricing terms, price protection, and rebates. *Id.* ¶¶108-09.

61. Lannett and the other conspirators coordinated their price increases. In addition to reaching agreements with competitors to allocate markets for a number of different generic drugs, global generic drug manufacturers – including Lannett – routinely, and as part of their regular course of business, entered into agreements to fix and raise prices for generic drugs. To effectuate this, a generic manufacturer would approach a competitor with the idea of raising prices of some of its products and would seek assurances from the competitor that he/she would also concurrently raise the price in order to avoid market share loss as a result of price disparity. As a result, both manufacturers would enjoy increased revenue from the price increase, as customers would not be able to resort to a less expensive seller, thereby defeating natural market forces brought about by competition. Such agreements were frequently entered into regarding bundles of generic drugs, allowing manufacturers to raise prices for many drugs. The Proposed

AG Complaint and the Securities Complaint[21] detail Lannett's participation in the illegal price fixing scheme as it relates to five specific generic drugs.

**1.    Lannett Colluded to Fix the Price of Doxycycline Monohydrate**

62.    Doxycycline Monohydrate ("Doxy Mono") is an antibiotic used to treat many kinds of infections, such as dental, skin, respiratory, and urinary tract infections, including acne, Lyme disease, and malaria.

63.    Around February 2013, Heritage Pharmaceuticals Inc. ("Heritage") learned of an anticipated price increase of a different form of Doxycycline, as well as a supply shortage experienced by certain manufacturers. Heritage saw an opportunity to increase the price of Doxy Mono, and accordingly, started reaching out to its competitors, including Lannett, in order to coordinate their planned price spikes.

64.    Lannett learned of Heritage's anticipated price increase on Doxy Mono no later than March 13, 2013. Lannett employees subsequently had internal discussions regarding the Doxy Mono price increase, which discussions were also had with Lannett's competitors, including in-person conversations during trade conferences, text messages, and telephone calls. Following these conversations, on June 12, 2013, Lannett increased the price of Doxy Mono.

65.    During the same time period, the four competitors who also produced Doxy Mono were in frequent communication with each other. Lannett was conversing with a representative of Par Pharmaceutical ("Par") and also Heritage, who reached out to Lannett to obtain specific pricing information regarding the price of Doxy Mono.

66.    As of March 2014, Heritage increased its price to at least one customer, with an eye toward a much larger increase on Doxy Mono. Indeed, during an April 22, 2014

---

[21]    *See* Securities Action, Second Amended Consolidated Securities Class Action Complaint (E.D. Pa. Dec. 14, 2017) (ECF No. 65) (the "Securities Complaint").

teleconference, Heritage's president, Jason Malek, identified 18 drugs that Heritage would target for price increase and instructed its sales team to connect with competitors with the goal of striking an agreement on the planned price increases. Accordingly, a Heritage sales representative had a 29 minute conversation with an employee at Lannett at which time they agreed to raise the price of Doxy Mono.

### 2. Lannett Colluded to Fix the Price of Digoxin

67. Digoxin is a medication used to treat congestive heart failure, most frequently atrial fibrillation and flutter, in adults. Digoxin is listed on the World Health Organization's list of essential medicines. According to IMS Health, annual sales of Digoxin in the United States, as of the beginning of 2014, were $44 million. By October of 2013, the generic Digoxin market was essentially a duopoly with 96% of the market controlled by Lannett and Impax Laboratories, LLC ("Impax"). As reflected in its SEC Form 10-Ks, Lannett's sales of generic Digoxin totaled $12.4 million in 2011; $10.9 million in 2012; $11.7 million in 2013; and $54.7 million in 2014. In 2014 and 2015, Par and Mylan N.V. ("Mylan"), respectively entered the generic Digoxin market.

68. During October 28-30, 2013, Impax, Lannett, and Par attended the Generic Pharmaceutical Association's ("GPhA") 2013 Fall Technical Conference in Bethesda, Maryland. Until then, the pricing for Digoxin was remarkably stable.[22] Shortly after the conference, however, the price of Digoxin increased more than 750% from $0.11 and $0.12 per tablet to $0.91 and $1.01 per tablet. This astounding price increase was the first one in more than four years. In the next month, the prices of Digoxin jumped again from $1.08 to $1.11 per tablet. Thus, the daily heart medication that cost $0.11 or $0.12 per tablet in early November of 2013 cost nearly ten times more by early January of 2014.

---

[22]     *See* Schondelmeyer Statement at 8, 16, *supra* n.12.

69.     These abnormal price increases occurred with an unusual degree of uniformity and without there being any market or industry related factors justifying their occurrence. Namely, no supply disruption was reported with respect to Digoxin in the fall of 2013; and there were no new patents or formulations, no clinical investigator inspections, and no drug labeling changes, nor were there any post-market requirements instituted by the FDA. Neither did the presence or absence of competition in the marketplace affect the price of Digoxin. Rather, Digoxin's price remained steadily elevated, even though West-Ward Pharmaceuticals Corp. ("West-Ward") suspended its production for a time, and even after Par and Mylan entered the market in early 2014 and 2015, respectively. Notably, Par set its Digoxin price at the same elevated level as the two seasoned manufactures, instead of at a discount as is typical for new entrants.

70.     Tellingly, when asked during a February 6, 2014 earnings call about possible discounting in light of Par's entry into the Digoxin market, Defendant Bedrosian confidently stated: "Well, with discounting to our price, no. We've seen their prices discounted to the brand of course, but *we're not troubled by their pricing in the marketplace, not at all.*" [Emphasis added.] In the quarterly earnings call held on November 3, 2014, Defendant Bedrosian again expressed confidence that Lannett would not have to engage in price competition, stating that Lannett's competitors were "less concerned about grabbing market share. We're all interested in making a profit, not how many units we sell." Defendant Bedrosian professed that Par and Impax are not "irrational players [who would] just go[] out and try[] to grab market share." He also noted that he did not expect "anything crazy" from Mylan and predicted that price increases would continue. On February 4, 2015, in another quarterly earnings call, Defendant Bedrosian confirmed there would be a moratorium on price competition. He stated: "I think you're going

to find more capital pricing [in the generic marketplace] -- more -- *I'll say less competition, in a sense*. You won't have price wars." [Emphasis added.]  In his view, "I just don't see the prices eroding like they did in the past."

### 3.    Lannett Colluded to Fix the Price of Levothyroxine Sodium Tablets

71.    Levothyroxine Sodium ("Levothyroxine") is a synthetic replacement hormone that is used to treat hypothyroidism, enlarged thyroid glands, and thyroid cancer. Levothyroxine comes in 12 potencies and is the second most prescribed generic drug in the United States. Levothyroxine is listed on the World Health Organization's list of essential medicines.  In 2013, the market for Levothyroxine was highly concentrated among four manufacturers.  As reflected in its SEC Form 10-Ks, Lannett's net sales of Levothyroxine totaled $102.3 million in 2014; $153.5 million in 2015; $162.4 million in 2016; and $174.0 million in 2017.  Throughout these years, Lannett controlled between 14-17% of the market for Levothyroxine.

72.    Generic Levothyroxine has been on the market for many years and, for most of that time, has been priced below its branded counterparts, costing approximately $0.25 per tablet. In the recent years, however, Levothyroxine underwent a series of unusual and unprecedented price increases.  As reflected in the analysis of the National Association of State Medicaid Directors (the National Average Drug Acquisition Cost ("NADAC")), each of the 12 potencies of Levothyroxine jumped in price by an average of 79% between October and November 2013. In November 2013, the price for all 12 potencies of Levothyroxine increased in unison by an average of 214%.  Prices in the months of August and September 2014 for all 12 strengths of Levothyroxine represented increases of 188-231% above the October 24, 2013 prices.

73.    Absent changes in the market or supply shortages, competition in the market for generic Levothyroxine would have remained at its pre-2013 levels.  This is especially so given that Levothyroxine is required by law to be bioequivalent, meaning price is the only factor on

26

which manufacturers may compete. At the time of the coordinated price hike, Levothyroxine had no supply or production issues to justify the price increase, there were no clinical investigator inspections, no drug safety labeling changes, and no post-market requirements and commitments required by the FDA.[23]

74.     Notably, each of the price increases occurred close on the heels of GPhA conferences, which were attended by industry executives and provided an opportunity to collude with one another and develop a strategy for their price spikes. Lannett and other conspirators effectuated their conspiracy by direct contacts, secret communications and meetings, and/or joint participation taken under the guise of trade associations and other business events.

75.     Thus, as alleged by the 46 state attorneys general, the sudden unexplained and sustained price increases were the result of collusive price-fixing, instead of being a result of market forces. Abnormal price moves by Lannett, Mylan, and Sandoz AG ("Sandoz") were correlated with an unusual degree of uniformity, corresponding to a 99% correlation indicative of collusion.[24]  There was also unusually low variance between the Levothyroxine prices for Lannett and its competitors, yielding only 0.02% variance between Mylan and Sandoz.[25]

76.     Defendant Bedrosian publicly praised competitors for playing their part in the conspiracy and encouraged their "responsible" behavior in raising prices of Levothyroxine. For example, during the September 10, 2013 earnings call, Defendant Bedrosian was asked for his thoughts on Mylan's significant price increase for Levothyroxine to which Bedrosian replied, "You mean after I sent them the thank you note?"  He then elaborated: "So, whenever people

---

[23]     While there was a shortage reported for Levothyroxine, it was not reported by Lannett. Instead, it was reported by Pfizer Inc. Because the shortage is minor, it would have had no material effect on the overall supply of Levothyroxine.

[24]     *See* Securities Complaint ¶81

[25]     *See id* ¶83

27

start acting responsible and raise prices as opposed to the typical spiral down of generic drug prices, I'm grateful because Lannett tends to be active in raising prices[,] . . . so I'm grateful to see price increases." During the same call, Defendant Bedrosian commented on the two potential competitors that could enter the Levothyroxine market:

> [B]ut hopefully, both companies turn out to be responsible companies and don't go into the marketplace. *We're seeing more responsibility on the part of all of our competitors*. I believe because all of us are facing the same costs. . . . I would expect that all the companies are not going to behave like they have in the past. *I suspect you're going to see more price increases in the generic marketplace or certainly less price erosion in the marketplace because of that.*

[Emphasis added.]

### 4. Lannett Colluded to Fix the Price of Acetazolamide

77. Acetazolamide is a medication used to treat glaucoma, epilepsy, altitude sickness, periodic paralysis, idiopathic intracranial hypertension, and heart failure. Acetazolamide is listed on the World Health Organization's list of essential medicines. Between 2013 and 2017, Lannett and Taro Pharmaceutical Industries Ltd. ("Taro") were the only two producers of generic Acetazolamide. According to its SEC Form 10-Ks, Lannett's most recent net sales of Acetazolamide tablets totaled $25.3 million in 2016 and $18.8 million in 2017.

78. Beginning in 2009, but prior to 2014, the price of Acetazolamide sold by Lannett gradually decreased, as Lannett sought to seize more market share away from Taro. Indeed, Lannett's pricing of Acetazolamide decreased even as Taro increased its prices. In February 2014, shortly after the October 2013 GPhA meeting took place, the price of Acetazolamide suddenly spiked to more than double its pre-2014 level, rising from $0.97 to $2.03 per tablet. Notably, Taro also raised is price of Acetazolamide in the exact same week as Lannett did, more than tripling the price of its Acetazolamide from $0.53 to $1.79 per tablet. Since then, both

28

companies have maintained their respective prices of Acetazolamide at a relatively comparable supra-competitive level.

79.      Notably, there have been no supply shortages, no known Acetazolamide production issues, no clinical investigator inspections, no labeling changes, no post-market requirements and commitments mandated by the FDA, and no change in formulations or new patents to explain the price increase.  In this environment, a rational competitor would have used its rival's sudden and sharp price increase to its advantage by undermining the rival's price, thereby capturing market share for itself and away from the rival.  Taro and Lannett instead colluded to raise their prices simultaneously and continued to maintain them at their elevated levels.  Such collusive price-fixing allowed Lannett and Taro to extract supra-competitive prices from the market, without the fear of losing market share, as would be the case, but for the collusion between them.  Indeed, Lannet and Taro's synchronized price increases yield to a 98% correlation.[26]

### 5.      Lannett Colluded to Fix the Price of Ursodiol

80.      Ursodiol is a bile acid that decreases the amount of cholesterol produced by the liver and absorbed by the intestines.  In the United States, it is widely prescribed for dissolution of certain types of gallstones.  Ursodiol has been available in generic form since 2000.  Annual sales of Ursodiol in North America exceed $100 million annually.  Since 2014, the market for generic Ursodiol was highly concentrated with Lannett, Actavis Holdco U.S., Inc. ("Actavis"), and Epic Pharma, LLC ("Epic") controlling in excess of 90% of the market.  As reflected in its SEC Form 10-Ks, Lannett's most recent net sales of Ursodiol totaled $65.3 million in 2015; $67.3 million in 2016; and $48.6 million in 2017.

---

[26]      *See* Securities Complaint ¶94.

81.     For the period of December 2010 through about April 2014, the price of Ursodiol remained relatively stable.  At that time, a 300 mg Ursodiol capsule sold on average for as low as $0.28 per capsule.  However, following industry events attended by Lannett, Actavis, and Epic in February and June of 2014, the price of Lannett's Ursodiol hiked to $2.23 in July 2014.  Shortly thereafter, in September 2015, Ursodiol reach a shocking level of $4.73 per capsule, representing a whopping 1,590% increase.  The price of Epic's Urosdiol spiked to the same level during the same time period.  Ursodiol prices continued to remain well above their pre-May 2014 level through to the present.

82.     These abnormal price increases occurred with an unusual degree of uniformity and without there being any market or industry related factors justifying their occurrence. Namely, there were no supply disruption or shortages reported, no new patents or formulations, no clinical investigator inspections, and no drug labeling changes, nor post-market requirements issued by the FDA.  Indeed, no such price hikes occurred in other countries where Ursodiol was sold, including the United Kingdom, Denmark, or Norway.

83.     Therefore, and as alleged by the 46 state attorneys general, instead of being a result of natural market forces, these unexplained and sustained price increases were the result of collusive price-fixing among Lannett, Actavis, and Epic.  The abnormal price moves of these three manufacturers were correlated with an unusual degree of uniformity with respect to both timing and pricing.

84.     The manufacturers' regulatory filings and public statements to investors reveal that in 2014, Ursodiol suddenly became the "key" product for both companies.  Lannett's SEC Form 10-Ks for the fiscal years ended June 30, 2010 through June 30, 2014 did not list Ursodiol in its list of "key products."  Starting with the fiscal year ended June 30, 2015, Ursodiol ranked

30

amongst Lannett's top "key products." In only one year, Lannett's Ursodiol net sales went from $6.5 million to over $65 million – an increase of 900% over a period of one year. Lannett's Ursodiol sales accounted for over 16% of the Company's total sales that year.

85.     During an earnings call with investors preceding Lannett's May 2014 price increase, Defendant Bedrosian advised that price increases by competitors are welcomed and made clear that Lannett itself planned on pursuing a strategy based on price increases. On the September 10, 2013 earnings call held following Lannett's release of its fourth quarter 2013 financial results, Defendant Bedrosian signaled that "*[w]e have more price increases planned* for this year within our budgets and hopefully our competitors will follow suit. *If they don't, that's their issue*, but *our plan is to raise prices on any product that we think we can*, or we haven't raised the price." [Emphasis added.]

86.     Defendant Bedrosian continued to assure investors that he would be able to maintain Ursodiol's high prices. For example, in connection with the Company's release of its fourth quarter 2014 financial results, Defendant Bedrosian stated that the Company forecasted strong Ursodiol sales in the next several quarters. Then again, during the August 25, 2015 earnings call for the fourth quarter 2015 financial results, Defendant Bedrosian again expressed confidence in Lannett's ability to sustain higher generic drug pricing:

> And *everybody keeps bringing up the sustainability of price increases*.
>
> They seem to be sustainable. I'm not saying that there hasn't been some weakness, here and there. But overall, I'd say all *the price increases have been sustainable, and we are going into almost our third year, now*, with some of these increases. So we think it's a more rational market we are in.

[Emphasis added.]

## VI. THE COMPANY IS SUED FOR ITS MISCONDUCT BY PRIVATE PARTIES AND PUBLIC REGULATORS

87.     Defendants' misconduct has exposed the Company to a series of lawsuits brought by regulators and private litigants.  The generic drug makers' synchronized price increases became highly suspect, attracting regulators' scrutiny, which intensified over time.  The regulatory inquiries and investigations ultimately lead to the commencement of formal proceedings against Lannett and others, followed by the filing of dozens of private lawsuits alleging securities fraud, antitrust violations, and violations of consumer protection laws.

88.     Thus, as a direct and proximate result of the Individual Defendants' actions, Lannett has expended, and will continue to expend, significant sums of money, including: (i) the costs incurred from defending, settling, or paying any adverse judgments in the private lawsuits and enforcement actions filed against it; (ii) costs incurred from implementing any corrective and/or remedial measures ordered by state and federal authorities or agreed to by virtue of any settlement or a compromise; (iii) costs incurred from defending, settling, or paying any adverse judgment from any other legal actions pertaining to the Company's practices relating to Lannett's unlawful business practices; and (iv) costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to Lannett.  Finally, Lannett's business, goodwill, and reputation have been, and will continue to be, severely damaged by the Individual Defendants' decision to allow and/or failure to prevent the Company's systemic violation of state and federal laws.

### A. Lannett Becomes the Subject of Intense Scrutiny by Federal and State Regulators

89.     As set forth in detail below, beginning in 2013, Lannett's and other generic pharmaceutical makers' skyrocketing prices of generic drugs attracted the scrutiny of regulators.  In 2014, members of Congress initiated inquiries into Lannett and 13 other manufacturers,

32

followed by a series of Senate hearings. Shortly thereafter, the CTAG launched its own investigation into the same underlying misconduct, eventually finding that Lannett and 17 other makers had conspired to fix the price of over a dozen generic medications. Meanwhile, in 2014, the DOJ convened a criminal grand jury to investigate collusion in the industry, which investigation has since secured the guilty pleas of two former senior-level executives for their participation in conspiracies to fix prices, rig bids, and allocate customers for certain generic drugs. The DOJ Probe has grown to span more than a dozen generic companies, about two dozen drugs, and remains ongoing.

### 1. Congress Investigates the Causes for the Skyrocketing Prices of Generic Drugs

90. Congress also launched an investigation into generic drug pricing. Beginning in February 2015, members of Congress became interested in the accessibility and affordability of prescription drugs after receiving correspondence from consumers, who informed them of exorbitant price increases on certain medications. As part of their effort to get to the bottom of the skyrocketing price increases, both the House and Senate formed groups to combat rising prescription prices. Representative Elijah E. Cummings and Senator Bernard Sanders sent letters to 14 drug manufacturers – including Lannett – requesting information about the escalating prices they have been charging for generic drugs (the "Congressional Letter"). The Congressional Letter, addressed directly to Defendant Bedrosian, requested information regarding, *inter alia*, the Company's gross revenues, total expenses relating to the sales of its drugs, cost estimates relating to the Company's current and future sales, and factors contributing to the price increases. Subsequently, a Senate Committee conducted a series of hearings, one of which took place on November 20, 2014, entitled "Why Are Some Generic Drugs Skyrocketing

33

in Price?" (the "Senate Hearing"). Although Defendant Bedrosian was invited to attend, neither he nor any other CEO of the invited generic drug manufacturers showed up to testify.

91.      During the course of the congressional investigation, the Special Committee on Aging held three hearings; interviewed scores of patients, doctors, hospital administrators, consumer advocates, health experts, pharmaceutical industry executives, and board members; reviewed more than one million pages of documents obtained from pharmaceutical companies; and deposed or reviewed transcribed interviews of numerous corporate witnesses.

92.      Meanwhile, as the congressional investigation continued, Lannett's executives went out of their way to keep their fraudulent conduct concealed. During the earnings calls with analysts, Lannett's management offered a variety of benign justifications for the price increase, such as industry consolidation, FDA-mandated plant closures, and/or the elimination of unprofitable product lines. Further, during the November 7, 2013 earnings call, Defendant Bedrosian defended Lannett's price increases by pointing to the exit of a competitor: "*[w]e've had a recent price increase on [the generic Digoxin] product as well because we're now only one of two people in the market.*" [Emphasis added.] Still, in early 2015, according to Defendant Bedrosian during the February 4, 2015 earnings call, "significant . . . cost increases [were] driving [the price increases]," which he regarded as "really unfortunate." Regulators, however, argued that the reasons underlying generic price increases were more sinister than that -- namely, that they were the result of a widespread illegal conspiracy among generic drug makers who colluded to fix prices and allocate markets in order to keep the prices of generic pharmaceuticals inflated and prevent price competition from occurring.

### 2. 40 State Attorneys General Bring an Antitrust Suit Against Lannett, Alleging an Industry-Wide Conspiracy to Fix Prices of Generic Drugs

93.     Lannett and its competitors subsequently became the subject of an investigation by the CTAG. Some time prior to 2014, the CTAG initiated a non-public antitrust investigation into the soaring prices of Digoxin – one of Lannett's leading drugs for the treatment of heart failure.[27] As part of the investigation, Lannett, Impax, and Par were subpoenaed concerning a conspiracy to restrain trade by fixing the price of Digoxin or allocating and dividing customers or territories. The CTAG's inquiry concerned whether anyone engaged in any activities that resulted in "fixing, maintaining or controlling prices of digoxin or . . . allocating and dividing customers or territories relating to the sale of digoxin in violation of Connecticut antitrust law."[28]

94.     The CTAG's investigation crystalized into concrete allegations. Based on the evidence and information developed during the investigation, Connecticut and 20 states filed a suit, in December 2016, against six generic drug makers, alleging that they entered into numerous contracts, combinations, and conspiracies that had the effect of unreasonably restraining trade, artificially inflating and maintaining prices, and frustrating competition in the generic drug industry. According to the lawsuit, generic manufacturers' senior management routinely interacted and communicated with each other directly, and in-person, during industry trade shows, various conferences, and recreational and social events where they "discuss[ed] and share[d] upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers, among other competitively-sensitive information." State AG Complaint ¶51. These anticompetitive agreements were further refined and coordinated at regular industry dinners, social nights out, and through other lunches, parties, phone calls,

---

[27]     *See* Press Release, Lannett Co., Inc., Lannett Receives Inquiry from Connecticut Attorney General (July 16, 2014), http://lannett.investorroom.com/2014-07-16-Lannett-Receives-Inquiry-From-Connecticut-Attorney-General.

[28]     *Id*

emails, and text messages. *Id.* ¶¶53-57. At the time of the filing of its original complaint, the CTAG confirmed that its price-fixing investigation extended "'way beyond the two drugs and the six companies. . . . We're learning new things every day.'"[29]

95.     Lannett's executives dismissed the legitimacy of the CTAG's investigation. During one investor conference, Lannett's management maintained that Lannett has "done nothing wrong, *so we're going to continue to operate our business regardless of any investigation*." [Emphasis added].     Defendant Bedrosian continued to disparage the investigation at the Oppenheimer Healthcare Conference on December 8, 2014, when he told the audience: "The Connecticut Attorney General decided to investigate the price increases, assuming . . . that we meet in hotel rooms with competitors and do things like that, which is nonsensical[.]"

96.     The CTAG's investigation expanded to additional defendants and drugs. The CTAG was later joined by additional attorneys general of 22 states, and in October 2017, the State AG Complaint was extended to include an additional 13 drugs, for a total of 15 drugs, and 12 new defendants – including Lannett – for a total of 20 defendants. The State AG Action was subsequently transferred and made part of the multidistrict litigation pending in the Eastern District of Pennsylvania.

### 3.     DOJ Commences a Criminal Investigation into the Generic Drug Conspiracy

97.     The DOJ commenced its own investigation. Following the release of a 2014 survey conducted by the NCPA, which found that pharmacy acquisition prices have risen by as much as 1,000% or more, the DOJ launched its own criminal investigation. By late 2014, the

---

[29]     Liz Szabo, et al., *How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices*, DailyBeast.com (Dec 21, 2016, 1:02 AM ET), https://www thedailybeast.com/how-martinis-steaks-and-a-golf-round-raised-your-prescription-drug-prices.

DOJ convened a grand jury in the District of Pennsylvania, which issued a subpoena to Lannett's Senior Vice President of Sales and Marketing relating to possible violations of the Sherman Act.[30]   Shortly thereafter, the grand jury also issued subpoenas to a number of generic manufacturers, including Lannett.   The subpoena addressed to the Company related to the "continuing federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act" and asked for corporate documents related to the "sale of generic prescription medications, and the marketing, sale, or pricing of certain products."[31]   Lannett's competitors, Impax and Par, likewise received subpoenas from the DOJ on November 7 and December 5, 2014, respectively.

98.    On December 12 and 13, 2016, the DOJ filed its first criminal charges in the case, which stemmed from its ongoing investigation and were levied against Heritage's CEO and Chairman and Senior Vice President of Commercial Operations for violation of §1 of the Sherman Act by participating in conspiracies to fix prices, rig bids, and allocate customers with other generic drug manufacturers.[32]   Both executives pled guilty in January 2017.   The DOJ has made clear that its "investigation is ongoing,"[33] and the evidence uncovered during the course of its investigation into those drugs also "*implicates . . . a significant number of the Defendants . . . [and] a significant number of the drugs at issue*" in the Antitrust Action.[34]   [Emphasis added.]

---

[30]      *See* Lannett Co , Inc., Quarterly Report at 16 (Form 10-Q) (Nov. 6, 2014).

[31]      Lannett Co., Inc., Current Report at 2 (Form 8-K) (Dec. 8, 2014).

[32]      *See United States v  Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016); *United States v  Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Dec. 13, 2016).

[33]      DOJ, *Division Update Spring 2017  Division Secures Individual and Corporate Guilty Pleas for Collusion Affecting Millions of American Consumers* (Mar. 28, 2017), https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products.

[34]      Antitrust Action, Intervenor United States' Motion to Stay Discovery at 1-2 (E.D. Pa. May 1, 2017) (ECF No. 279)

**B.     Dozens of Private Lawsuits Are Filed Against Lannett, Alleging Antitrust, Securities Fraud, and Consumer Protection Violations**

**1.     Lannett Is Sued in a Securities Fraud Class Action, Alleging that Lannett's Management Misled the Public Regarding Its Revenue Source, Generic Competition, and Compliance with Laws and Regulations**

99.     Notwithstanding the fact that Lannett's management was fully aware that: (i) Lannett depended on the escalating prices of its drugs for the attainment of its revenue goals; (ii) its pricing strategy was unsustainable in the long run; (iii) the pricing methodology it used was not driven by natural market forces, but instead, was a result of a collusion; and (iv) Lannett did not comply with the applicable state and federal laws and regulations, the Company's management continued to assure the public of its growing revenue, fierce competition in the generic market, Lannett's own competitive edge, and its compliance, without disclosing that pricing in the generic drug industry was the product of illegal, anticompetitive conduct, that Lannett's revenue was inflated through illegal price-fixing scheme, and that the Company did not fully comply with the applicable state and federal laws and regulations, thereby exposing the Company to a significant risk of prosecution by state and federal authorities along with attendant negative financial and reputational harm.

100.     As a result of the misstatements included in Lannett's public disclosures, in November 2016, the Securities Action was filed in the U.S. District Court for the Eastern District of Pennsylvania against the Company and two of its officers, alleging false and misleading statements in Lannett's regulatory disclosures, relating to the Company's pricing methodologies, and its internal controls, with respect to drug pricing methodologies, in violation of §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  The Securities Action further alleges that the Company and its executives, including Defendants Bedrosian and Galvin, knew, but failed to disclose, that: (i) Lannett depended on the escalating prices of its drugs for

the attainment of its revenue goals; (ii) its pricing strategy was unsustainable in the long run; (iii) the pricing methodology it used was not driven by natural market forces, but instead, was a result of a collusion; and (iv) Lannett did not comply with the applicable state and federal laws and regulations. In addition, the Securities Action alleges that Lannett's management affirmatively, and falsely, continued to assure the public of its growing revenue, fierce competition in the generic market, Lannett's own competitive edge, and its compliance, without disclosing that pricing in the generic drug industry was the product of illegal, anticompetitive conduct, that Lannett's revenue was inflated through an illegal price-fixing scheme, and that the Company did not fully comply with the applicable state and federal laws and regulations, thereby exposing the Company to a significant risk of prosecution by state and federal authorities, along with attendant negative financial and reputational harm.

101. To fool shareholders into believing that Lannett's sales were the result of the Company's competitive advantage in a fiercely competitive environment, Lannett's management made a number of false and misleading statements, all of which the Audit Committee reviewed as a part of its obligations to the Company as laid out in the Audit Charter.

102. For instance, in its May 9, 2013 SEC Form 10-Q filed for the third quarter of fiscal 2013 (the "May 2013 10-Q"), Lannett warned of the possibility of fluctuating production costs, stating that "[p]ricing pressure from competitors and costs of producing or purchasing new drugs may also fluctuate in future periods. Changes in the future sales product mix may also occur." The May 2013 10-Q also stated that "manufacturers and distributors are constantly faced with pricing pressures in the marketplace as competitors attempt to lure business from distributors, wholesalers and chain retailers by offering lower prices than the incumbent supplier." Lannett's management vouched for the accuracy of these statements as being

39

"prepared in accordance with U.S. generally accepted accounting principles."[35]  In the May 2013

10-Q, Lannett's management certified that they evaluated the effectiveness of Lannett's internal

controls and disclosed any deficiencies or material weaknesses in them.

103.    On August 15, 2013, during the Cannacord Genuity Growth Conference,

Defendant Bedrosian inflated the competitive landscape, stating "we compete with every one of

the major players -- Teva or Watson . . . Mylan, Sandoz, every single one of them we have

products that compete with. . . . [M]y biggest selling product, the levothyroxine sodium product,

I and Mylan have the two biggest market shares in the country."

104.    Similarly, Lannett's SEC Form 10-K, filed for the fiscal year ended June 30, 2013

(the "2013 Annual Report"), misstated the purported competitiveness of the generic

pharmaceutical market, as well as Lannett's own relationship to other industry participants.

Specifically, Lannett's management reiterated that Lannett competed with two brand versions of

Levothyroxine manufactured by Abbott Laboratories and Monarch Pharmaceuticals, Inc., as well

as two generic versions from Impax and West-Ward. In connection with these competitors, the

2013 Form 10-K concluded that "*[t]he generic pharmaceutical industry is highly competitive*,"

and consequently, "*[Lannett] face[s] strong competition in [its] generic product business.*"

[Emphasis added and in original.]

105.    With respect to the Company's compliance with the applicable rules and

regulations, the 2013 Annual Report assured shareholders that "*[w]e monitor our compliance

with laws and we believe we are in substantial compliance with all regulatory bodies.*"

[Emphasis added.]  Lannett bolstered these representations by apprising shareholders that the

Company "has adopted the Code of Professional Conduct . . . that applies to the Company's

---

[35]        Substantially similar representations were made by Lannett in its SEC Form 10-K for the fiscal year ended
June 30, 2013 and Form 10-Q for the quarter ended September 30, 2013.

[CEO] and [CFO], as well as other company personnel" and mandates that confidentiality of information that may be of use to competitors be strictly maintained.

106. To impress upon shareholders how competitive the generic pharmaceutical market was, Defendant Bedrosian repeatedly referenced the pricing pressure resulting from the presence or entry of new competitors. For example, during the November 7, 2013 earnings call with analysts, Defendant Bedrosian stated: "we're in a commodity business, *so it's always hard to determine when you're going to get additional competition or when prices will erode as they generally do.*" [Emphasis added.] Similarly, the SEC Form 10-Q filed the next day, November 8, 2013, stated: "*[p]ricing pressure from competitors and costs of producing or purchasing new drugs may also fluctuate in future periods.*" [Emphasis added.]

107. On February 6, 2014, Lannett issued a press release announcing its financial results for the second quarter of fiscal 2014, attached as Exhibit 99.1 to SEC Form 8-K (the "February 2014 Release"). The February 2014 Release touted Lannett's financial performance without once disclosing that Lannett's revenue was inflated due to its participation in the price-fixing conspiracy. More specifically, Lannett reported that its "*net sales rose 84% to $67.3 million from $36.6 million in last year's second quarter*" and that its "*[g]ross profit more than tripled to $41.0 million, or 61% of net sales.*" [Emphasis added.] Defendant Bedrosian was quoted in the February 2014 Release, stating: "'*Our excellent financial performance was driven by price increases, strong sales of existing products and favorable product mix.*'" [Emphasis added.]

108. Lannett made similar revenue-reporting statements in its SEC Form 10-Q filed on the following day, February 7, 2014 (the "February 2014 10-Q"), where it reiterated that "[a]lthough the Company has benefited from [ ] favorable pricing trends, the level of competition

in the marketplace is constantly changing and the Company cannot guarantee that these pricing trends will continue." The February 2014 10-Q went on to list a number of factors that purportedly contributed to the increase in sales volume of its major drug products, with "price increases" being the most common factor. Finally, the February 2014 10-Q once again reiterated that "*[p]ricing pressure from competitors and costs of producing new drugs may also fluctuate in future periods*" and contained SOX certifications signed by Defendants Bedrosian and Galvan.

109. On May 7, 2014, the Company issued a press release preliminarily announcing the financial results for the third quarter of fiscal 2014, attached as Exhibit 99.1 to SEC Form 8-K (the "May 2014 Release"). The May 2014 Release touted Lannett's attainment of net sales of $80 million, representing an increase of over 100% as compare to the same quarter in the previous year. Defendant Bedrosian was quoted in the May 2014 Release, stating, in relevant part, that the Company's "*'excellent financial performance was largely driven by price increases across multiple product categories and strong sales of existing products.'*" [Emphasis added.]

110. Two days later, on May 9, 2014, Lannett filed its SEC Form 10-Q (the "May 2014 10-Q"), reporting net sales increase of 105% to $80 million, purportedly due to price increases on several key products. The May 2014 10-Q commented on the price increase, stating, in relevant part:

> The Company experienced favorable trends in product pricing on several key products during the period, as discussed below. Although the Company has benefited from these favorable pricing trends, the level of competition in the marketplace is constantly changing and the Company cannot guarantee that these pricing trends will continue.

42

111.    With respect to these and other disclosures provided in its May 2014 10-Q, the Company certified that its disclosure controls and procedures were effective and contained SOX certifications signed by Defendants Bedrosian and Galvan.

112.    On August 27, 2014, Lannett published a press release, attached as Exhibit 99.1 to SEC Form 8-K, preliminarily announcing its financial results for the fourth quarter of fiscal 2014. Defendant Bedrosian was quoted, stating that "*[Lannett's] excellent financial results are due, in large part, to [its] loyal and supportive customers, as well as [its] dedicated employees, who are committed to making Lannett a formidable force in the generic drug industry.*'" [Emphasis added.]

113.    A few days later, on August 29, 2014, Lannett filed an annual report on SEC Form 10-K for fiscal year 2014 (the "2014 Annual Report"), which misrepresented that the Company "continue[d] to improve [its] financial performance by expanding [its] line of generic products, increasing unit sales to current customers, creating manufacturing efficiencies, and managing [its] overhead and administrative costs." The 2014 Annual Report also discussed the competitive landscape, stating, in relevant part:

**Competition**

*The manufacturing and distribution of generic pharmaceutical products is a highly competitive industry. Competition is based primarily on price. In addition to competitive pricing our competitive advantages are our ability to provide strong and dependable customer service by maintaining adequate inventory levels, employing a responsive order filling system and prioritizing timely fulfillment of orders. We ensure that our products are available from national suppliers as well as our own warehouse. The modernization of our facilities, hiring of experienced staff and implementation of inventory and quality control programs have improved our competitive cost position over the past five years.*

*We compete with other manufacturers and marketers of generic and brand name drugs. Each product manufactured and/or sold by us has a different set of competitors.*

43

* * *

*We face strong competition in our generic product business. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors.* As patents for brand name products and related exclusivity periods expire or fall under patent challenges, the first generic manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration. As competing off-patent manufacturers receive regulatory approvals on similar products or as brand manufacturers launch generic versions of such products (for which no separate regulatory approval is required), market share, revenues and gross profit typically decline, in some cases dramatically. *Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product is normally related to the number of competitors in that product's market and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our revenues and gross margins.*

[Emphasis added and in original.]

114.    Additionally, the 2014 Annual Report stated that "*[p]ricing pressure from competitors and costs of producing or purchasing new drugs may also fluctuate in future periods [and] changes in future product sales mix may also occur.*"  The 2014 Annual Report contained a certification by the CEO and CFO that "the [Company's] controls and procedures are effective[,]" as well as SOX certifications signed by Defendants Bedrosian and Galvan.

115.    On November 3, 2014, Lannett issued a press release, attached as Exhibit 99.1 to SEC Form 8-K, reporting on its financial results for the first quarter of fiscal 2015.  Lannett reported that its sales "doubled to $93.4 million from $45.8 million[,]" as compared to the same quarter in the previous year, and its "[g]ross profit was $71.6 million, or 77% of net sales."

116.    A few days later, on November 6, 2014, the Company filed its SEC Form 10-Q (the "November 2014 10-Q"), which reported an "overall increase in net sales [as a result of] . . . favorable trends in product pricing on several key products during the period[.]"  The November 2014 10-Q also discussed the sustainability of the Company's gross profit, stating that "*[t]he*

44

*Company is continuously seeking to keep product costs low, however there can be no guarantee that gross profit percentages will stay consistent in future periods. Pricing pressure from competitors and costs of producing or purchasing new drugs may also fluctuate in future periods.*" [Emphasis added.] The November 2014 10-Q contained a certification by the CEO and CFO, vouching for the adequacy of the Company's disclosure controls and procedures, as well as SOX certifications signed by Defendants Bedrosian and Galvan.

117.    On February 4, 2015, Lannett issued a press release, attached as Exhibit 99.1 to SEC Form 8-K (the "February 2015 Release"), reporting on Lannett's preliminary financial results for the second quarter of fiscal 2015. In the February 2015 Release, Bedrosian was quoted, stating in regard to the Company's sales: "'***Strong sales and gross margin across a number of product categories drove our record financial results, . . . represent[ing] the ninth consecutive quarter of record net sales, as well as the twelfth consecutive quarter in which net sales and adjusted EPS exceeded the comparable prior-year period.***'" [Emphasis added.] Lannett also reported that its "net sales rose 84% to $208.2 million from $113.2 million in the comparable prior-year period."

118.    Similar to the previous quarterly disclosures, in its SEC Form 10-Q filed on February 6, 2015 (the "February 2015 10-Q"), Lannett apprised the shareholders of its attainment of net sales of $114.8 million, which represented a 71% growth over the second quarter of fiscal year 2014. The February 2015 10-Q also discussed the factors contributing to the financial results:

> Product price increases contributed $50.9 million to the overall increase in net sales, partially offset by decreased volumes of $3.4 million. ***The Company experienced favorable trends in product pricing on several key products during the period, as discussed below. Although the Company has benefited from these favorable pricing trends, the level of competition in the marketplace is***

*constantly changing and the Company cannot guarantee that these pricing trends will continue.*

*   *   *

*Thyroid Deficiency. Net sales of drugs used for the treatment of thyroid deficiency increased* by $18.3 million, primarily as a result of price increases on key products. *Increased volumes also added to the increase in net sales.*

*Gallstone. Net sales of drugs used for gallstones increased* by $15.6 million. The increase in net sales was primarily attributable to price increases, partially offset by decreased volumes.

*   *   *

*Migraine. Net sales of drugs used to treat migraines increased* by $4.6 million. The increase in net sales was primarily attributable to price increases on key products.

*   *   *

*Net sales to wholesaler/distributor increased as a result of increased sales in a variety of products for thyroid deficiency, gallstones and cardiovascular, as discussed above.*

*   *   *

While the Company is continuously striving to keep product costs low, there can be no guarantee that gross profit percentages will stay consistent in future periods. Pricing pressure from competitors and costs of producing or purchasing new drugs may also fluctuate in future periods. Changes in future product sales mix may also occur.

[Emphasis added and in original.]

The February 2015 10-Q contained a certification by the CEO and CFO, vouching for the adequacy of the Company's disclosure controls and procedures, as well as SOX certifications signed by Defendants Bedrosian and Galvan.

119.    On May 6, 2015, Lannett issued a press release announcing its financial results for the third quarter of fiscal 2015, attached as Exhibit 99.1 to SEC Form 8-K (the "May 2015 Release"). In the May 2015 Release, the Company touted its performance and announced raising its full year 2015 guidance. Defendant Bedrosian commented on Lannett's performance, stating:

"***Our third quarter performance reflects higher sales and gross margin*** across a number of product categories, partially offset by lower sales of our cardiovascular products, which as expected faced new entrants in the market."' [Emphasis added.]

120.    A few days later, on May 8, 2015, the Company filed its SEC Form 10-Q (the "May 2015 10-Q"), which reported on the purported product sales as contributing to the overall revenue increase, stating, in relevant part:

> ***For the third quarter of Fiscal Year 2015, net sales increased to $99.4 million, representing 24% growth over the third quarter of Fiscal Year 2014. Gross profit increased to $75.6 million compared to $56.1 million in the prior-year period and gross profit percentage increased to 76% compared to 70% in the prior-year period.***
>
> * * *
>
> ***Product price increases contributed $29.5 million to the overall increase in net sales, partially offset by decreased volumes of $10.1 million. The Company experienced favorable trends in product pricing on several key products during the period, as discussed below.*** Although the Company has benefited from these favorable pricing trends, the level of competition in the marketplace is constantly changing and the Company cannot guarantee that these pricing trends will continue.
>
> * * *
>
> ***Net sales to wholesaler/distributor increased as a result of increased sales in a variety of products for thyroid deficiency and gallstone, partially offset by decreases in cardiovascular[.]***

[Emphasis added.]

The May 2015 10-Q contained a certification by the CEO and CFO, vouching for the adequacy of the Company's disclosure controls and procedures, as well as SOX certifications signed by Defendants Bedrosian and Galvan.

121.    On August 26, 2015, the Company issued a press release, attached as Exhibit 99.1 to SEC Form 8-K (the "August 2015 Release"), announcing its financial results for the fourth quarter and full year of fiscal 2015.  Defendant Bedrosian was quoted in the August 2015

Release, stating that Lannett's "'fourth quarter performance was in line with expectations and *reflects higher sales and gross margin across a number of product categories[.]*"   [Emphasis added.]   The August 2015 Release reiterated that "[f]or the fiscal 2015 full year, *net sales rose 49% to $406.8 million from $273.8 million in the prior year.*"   [Emphasis added.]

122.   On the next day, August 27, 2015, Lannett filed an annual report on SEC Form 10-K (the "2015 Annual Report"), which stated, regarding the competitive environment:

> *We continue to improve our financial performance by expanding our line of generic products, increasing unit sales to current customers, creating manufacturing efficiencies, and managing our overhead and administrative costs.*
>
> * * *
>
> **Competition**
>
> *The manufacturing and distribution of generic pharmaceutical products is a highly competitive industry. Competition is based primarily on price. In addition to competitive pricing, our competitive advantages are our ability to provide strong and dependable customer service by maintaining adequate inventory levels, employing a responsive order filling system and prioritizing timely fulfillment of orders. We ensure that our products are available from national suppliers as well as our own warehouse. The modernization of our facilities, hiring of experienced staff and implementation of inventory and quality control programs have improved our competitive cost position over the past five years.*
>
> *We compete with other manufacturers and marketers of generic and brand name drugs. Each product manufactured and/or sold by us has a different set of competitors. The list below identifies the companies with which we primarily compete with respect to each of our major products.*
>
> * * *
>
> *We face strong competition in our generic product business. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors.* As patents for brand name products and related exclusivity periods expire or fall under patent challenges, the first generic manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration. As competing off-patent manufacturers receive regulatory approvals on similar products or as brand manufacturers launch generic versions

of such products (for which no separate regulatory approval is required), market share, revenues and gross profit typically decline, in some cases dramatically. ***Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product is normally related to the number of competitors in that product's market and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our revenues and gross margins.***

[Emphasis added and in original.]

The 2015 Annual Report contained a certification by the CEO and CFO, vouching for the adequacy of the Company's disclosure controls and procedures, as well as SOX certifications signed by Defendants Bedrosian and Galvan.

123.   On November 5, 2015, the Company filed its SEC Form 10-Q for the first quarter of fiscal 2016 (the "November 2015 10-Q"), which represented that the increase in net sales of its thyroid drug was primarily due to "***increased volumes . . . due to above average customer purchases*** in the fourth quarter of Fiscal Year 2014 in anticipation of a price increase in the first quarter of Fiscal Year 2015[.]"  [Emphasis added.]  The November 2015 10-Q contained SOX certifications signed by Defendants Bedrosian and Galvan.

124.   On February 9, 2016, the Company filed its SEC Form 10-Q for the second quarter of fiscal 2016 (the "February 2016 10-Q"), which represented that its "net sales increased 11% to $127.1 million for the three months ended December 31, 2015." The February 2016 10-Q contained SOX certifications signed by Defendants Bedrosian and Galvan.

125.   On May 10, 2016, the Company filed its SEC Form 10-Q for the third quarter of fiscal 2016 (the "May 2016 10-Q"), which represented that its "***net sales increased*** to $163.7 million, which included $69.9 million of net sales from recently acquired KUPI[,] . . . ***[g]ross profit, including the $23.6 million settlement agreement, decreased*** to $57.5 million compared to $75.6 million in the prior-year period and gross profit percentage decreased to 41% compared

to 76% in the prior-year period." [Emphasis added.] The May 2016 10-Q contained a certification by the CEO and CFO, vouching for the adequacy of the Company's disclosure controls and procedures, as well as SOX certifications signed by Defendants Bedrosian and Galvan.

126. On August 29, 2016, Lannett filed an annual report on SEC Form 10-K for fiscal year 2016 (the "2016 Annual Report"), which discussed the competitive landscape and the Company's and its competitors' market share, stating, in relevant part:

> *We are focused on increasing our market share in the generic pharmaceutical industry* while concentrating additional resources on the development of new products, with an emphasis on controlled substance products. *We continue to improve our financial performance by expanding our line of generic products, increasing unit sales to current customers, creating manufacturing efficiencies and managing our overhead and administrative costs.*
>
> * * *
>
> **Competition**
>
> *The manufacturing and distribution of generic pharmaceutical products is a highly competitive industry. Competition is based primarily on price. In addition to competitive pricing, our competitive advantages are our ability to provide strong and dependable customer service by maintaining adequate inventory levels, employing a responsive order filling system and prioritizing timely fulfillment of orders. We ensure that our products are available from national suppliers as well as our own warehouse. The modernization of our facilities, hiring of experienced staff and implementation of inventory and quality control programs have improved our competitive cost position.*
>
> We compete with other manufacturers and marketers of generic and brand-name drugs. Each product manufactured and/or sold by us has a different set of competitors.
>
> * * *
>
> **The generic pharmaceutical industry is highly competitive.**
>
> *We face strong competition in our generic product business. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors.* As patents for brand-name products and related exclusivity periods expire or fall under

patent challenges, the first generic manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration. As competing off-patent manufacturers receive regulatory approvals on similar products or as brand manufacturers launch generic versions of such products (for which no separate regulatory approval is required), market share, revenues and gross profit typically decline, in some cases dramatically. ***Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product is normally related to the number of competitors in that product's market and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our revenues and gross margins.***

[Emphasis added and in original.]

127.    Lannett reiterated that it competed with two brand and two generic makers in the market for Levothyroxine; five makers in the market for Digoxin; one major competitor in the market for Acetazolamide; and three makers in the market for Ursodiol. The 2016 Annual Report contained a certification by the CEO and CFO, vouching for the adequacy of the Company's disclosure controls and procedures, as well as SOX certifications signed by Defendants Bedrosian and Galvan.

128.    On November 4, 2016, the Company filed its SEC Form 10-Q for the first quarter of fiscal 2017 (the "November 2016 10-Q"), which touted the Company's performance, stating that its ***"net sales increased 5% as compared to the same prior-year period primarily due to price increases and, to a lesser extent, increased volumes from additional product launches."*** [Emphasis added.] The November 2016 10-Q contained a certification by the CEO and CFO, vouching for the adequacy of the Company's disclosure controls and procedures, as well as SOX certifications signed by Defendants Bedrosian and Galvan.

129.    On February 3, 2017, Lannett filed its SEC Form 10-Q for the second quarter of fiscal 2017 (the "February 2017 10-Q"), reporting that Lannett's "net sales increased to $170.9 million compared to $127.1 million in the same prior-year period" and that "[g]ross profit

increased to $88.1 million compared to $71.6 million in the prior-year period [representing a 23% increase] and gross profit percentage decreased to 52% compared to 56% in the prior-year period." The February 2017 10-Q contained a certification by the CEO and CFO, vouching for the adequacy of the Company's disclosure controls and procedures, as well as SOX certifications signed by Defendants Bedrosian and Galvan.

130.    On May 5, 2017, Lannett filed its SEC Form 10-Q for the third quarter of fiscal 2017 (the "May 2017 10-Q"), reporting a slight increase in the net sales, purportedly due to "*increased volumes*." [Emphasis added.]   The May 2017 10-Q also reiterated the impact of competitive pricing on net sales, stating:

> *Net sales were impacted by competitive pricing pressure across a number of products, product mix and changes within distribution channels. Although the Company has benefited in the past from favorable pricing trends, the trends are stabilizing and in many instances, have reversed. The level of competition in the marketplace is constantly changing and the Company cannot predict with certainty that these trends will continue.*

[Emphasis added.]

131.    On August 28, 2017, Lannett filed an annual report on SEC Form 10-K for fiscal year 2017 (the "2017 Annual Report"), which contained a certification by the CEO and CFO, vouching for the adequacy of the Company's disclosure controls and procedures, as well as SOX certifications signed by Defendants Bedrosian and Galvan.  The 2017 Annual Report discussed the competitive environment in which Lannett operates, stating, in relevant part:

> *We are focused on increasing our market share in the generic pharmaceutical industry* while concentrating additional resources on the development of new products, with an emphasis on controlled substance products. *We continue to improve our financial performance by expanding our line of generic products, increasing unit sales to current customers, creating manufacturing efficiencies and managing our overhead and administrative costs.*

* * *

52

**Competition**

*The manufacturing and distribution of generic pharmaceutical products is a highly competitive industry. Competition is based primarily on price. In addition to competitive pricing, our competitive advantages are our ability to provide strong and dependable customer service by maintaining adequate inventory levels, employing a responsive order filling system and prioritizing timely fulfillment of orders. We ensure that our products are available from national wholesale, chain drug and mail-order suppliers as well as our own warehouse.* The modernization of our facilities, hiring of experienced staff and implementation of inventory and quality control programs have improved our competitive cost position.

We compete with other manufacturers and marketers of generic and brand-name drugs. Each product manufactured and/or sold by us has a different set of competitors.

* * *

**The generic pharmaceutical industry is highly competitive.**

*We face strong competition in our generic product business. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors.* As patents for brand-name products and related exclusivity periods expire or fall under patent challenges, the first generic manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration. As competing off-patent manufacturers receive regulatory approvals on similar products or as brand manufacturers launch generic versions of such products (for which no separate regulatory approval is required), market share, revenues and gross profit typically decline, in some cases dramatically. *Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product is normally related to the number of competitors in that product's market and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our revenues and gross margins.*

[Emphasis added and in original.]

### 2.   Lannett Issues Additional Misleading Statements in Its Proxy Statements

132.   In addition to the misstatements identified in the Securities Action, Lannett's proxy statements made a number of false and misleading statements regarding Lannett's risk oversight and the responsibilities of the Director Defendants during the Relevant Period.   To

begin with, Lannett's proxy statements for the years 2014 through 2017 (collectively, the "Proxy Statements") each assured shareholders that "the Board, through the Audit Committee, provides oversight and reviews various details regarding the Company's risk mitigation efforts," and "[t]he Board is engaged in the Company's strategic planning efforts, which include evaluating the objectives and risks associated with these initiatives." The Proxy Statements thus assured shareholders that the Board was involved with Lannett's business strategy and actively monitored the Company's risk mitigation, when the truth was that the Board utterly failed in its oversight duties, allowing the Company to continue on a business strategy premised on supra-competitive profits illegally obtained through a price-fixing scheme generating the majority of the Company's revenues, all while being informed repeatedly of developing litigation liability generated from the regulatory and private actions resulting from the Company's anticompetitive and collusive conduct.

133.   In addition, Lannett's 2017 Proxy Statement, filed December 7, 2017, stated that "[a]fter several years of extraordinary performance through Fiscal 2015, our profitability and total shareholder return results were lower in Fiscal 2016 and 2017, ***primarily due to competitive pressures in the generic pharmaceutical market from consolidation among the largest chains and wholesalers into consortium purchasing groups, which resulted in lower average selling prices for our products.***" [Emphasis added.] This statement was false and misleading in contributing the Company's lower returns to "competitive pressures," when, in truth, the Company had been reaping supra-competitive profit from its price-fixing schemes in prior years and was unable to continue reaping such excessive profits after the CTAG filed its complaint against the Company in December 2016.

134.    Lannett's prior Proxy Statements were also false and misleading regarding the Company's supra-competitive profits, with each year attributing high revenues and explosive profitability to the Company's extraordinary or historical performance and strong leadership, lower revenues to the competitive nature of the market, and omitting the fact that Lannett was engaged in collusive price-fixing to attain such results.

135.    Lannett's 2016 Proxy Statement, filed December 12, 2016, contained the following false and misleading statements:

> After several years of extraordinary performance, our profitability and total shareholder return results were lower in Fiscal 2016, primarily due to some short-term challenges associated with the KUPI acquisition and softness in the generic pharmaceuticals market.

* * *

> In addition, we continued to make important advances in product development and mix, market share, and in our regulatory approval process, allowing us to efficiently and safely place our products that span a variety of categories (e.g., thyroid deficiencies, central nervous system, gastrointestinal, pain management, etc.) on the market.

These statements were false and misleading in that they attributed lower returns to "softness in the generic pharmaceuticals market," when Defendants knew that the generic pharmaceuticals markets for the majority of the Company's revenues were not competitive markets, and so, "softness" could not have been the cause of the Company's lower revenues.  In truth, the Company could not as brazenly commit to its price-fixing scheme given intense regulatory scrutiny and the filing of the CTAG's complaint against the Company, resulting in lower profits as regulatory forces began to act to bring the Company's prices on its largest generic drugs closer to competitive market levels.  These statements were also false and misleading in failing to disclose that the Company was party to a collusive price-fixing scheme which set the Company's

prices and market share, so that there was nothing "efficient" about the Company's product placement on the market.

136.    Lannett's 2015 Proxy Statement, filed December 8, 2015, contained the following false and misleading statements:

> Fiscal 2015 marked another extraordinary year for Lannett. Compared with Fiscal 2014 results, when we experienced the strongest growth in profitability in the Company's history, we increased net sales by 49%, operating income by 157%, and diluted earnings per share ("EPS") by 149%. Additionally, our stock price increased by approximately 20% during the 12-month period ending June 30, 2015 and by 1,302% over the past three years. We also further strengthened our balance sheet to help fund future growth opportunities. Our results demonstrate our leadership team's commitment to stability, growth and focus on long-term profitability and creating shareholder value.
>
> In addition to our financial results, we continued to make important advances in product development and mix, market share, and in our regulatory approval process, allowing us to efficiently and safely place our products that span a variety of categories (e.g., thyroid deficiencies, cardiovascular, paint management) on the market.

These statements were false and misleading in that they attributed Lannett's "extraordinary year" and the "strongest growth in profitability in the Company's history" to the Company's supposedly strong leadership.  In truth, and as Defendants knew, the supra-competitive revenues Lannett achieved in the generic pharmaceutical markets in 2015, for the majority of the Company's revenues, were not competitive markets due to the illegal price-fixing and market sharing strategies in which Lannett's management was engaged.  These statements were also false and misleading in failing to disclose that the Company was party to a collusive price-fixing scheme, which set the Company's prices and market share, so that there was nothing "efficient" about the Company's product placement on the market.

137.    Lannett's 2014 Proxy Statement, filed December 16, 2014, contained the following false and misleading statements:

Fiscal 2014 marked another extraordinary year for Lannett. We experienced the strongest growth in net sales and profitability in our Company's history, and our stock price increased by 317% during the 12-month period ending June 30, 2014 and by 896% over the past three years. We also further strengthened our balance sheet to help fund future growth opportunities. Our results demonstrate our leadership team's commitment to stability, growth and focus on long-term profitability and creating shareholder value.

In addition to our financial results, we made important advances in product development and mix, market share, and the regulatory approval process, allowing us to efficiently and safely place our products that span a variety of categories (e.g., thyroid deficiencies, cardiovascular, pain management) on the market.

These statements were false and misleading in that they attributed Lannett's "extraordinary year" and the "strongest growth in net sales and profitability in [the] Company's history" to the Company's supposedly strong leadership and focus on long-term growth. In truth, and as Defendants knew, the supra-competitive revenues Lannett achieved in the generic pharmaceutical markets in 2014, for the majority of the Company's revenues, were not competitive markets due to the illegal price-fixing and market sharing strategies in which Lannett's management was engaged. These statements were also false and misleading in stating that management was engaged in a strategy involving "long-term profitability," as Defendants knew that Lannett's collusive price-fixing schemes were a short-term strategy to reap supra-competitive profits in violation of antitrust law and could not be sustained. These statements were also false and misleading in failing to disclose that the Company was party to a collusive price-fixing scheme, which set the Company's prices and market share, so that there was nothing "efficient" about the Company's product placement on the market.

### 3.  Dozens of Private Lawsuits Follow the Regulators' Investigation

138.   In addition to the litigation brought by regulators and the securities fraud claims brought against the Company (described *supra* at §VI(B)(1)), additional private parties initiated actions against Lannett, alleging violations of antitrust and consumer protection laws. In 2016

and 2017, Lannett and certain of its competitors were named as defendants in a number of lawsuits alleging that they conspired to fix prices of generic Digoxin, Levothyroxine, Ursodiol, and Baclofen.  These antitrust cases are part of larger group of more than 100 lawsuits generally alleging that approximately 50 generic manufacturers and distributors conspired to fix prices for at least 18 different generic drugs in violation of the federal Sherman Act, various state and federal antitrust laws, and consumer protection statutes.  These cases were consolidated in April 2017 in the U.S. District Court for the Eastern District of Pennsylvania, captioned *In re: Generic Pharm. Pricing Antitrust Litig.*, No. 2:16-md-02724.

**VII.**  ██████████████████████████████████████████████

**A.**  ████████████████████████████████████████████

139.    As a result of the Individual Defendants' misconduct, Lannett failed to comply with state and federal laws and regulations and instead engaged in two brazenly unlawful schemes to conspire with its competitors to fix the price of vital generic pharmaceuticals.  The Individual Defendants violated their fiduciary duties to the Company by allowing Lannett to violate the applicable laws and regulations and failing to take any action to curtail management's deliberate price-fixing scheme, even after detailed allegations regarding the scope, methods, and extent of the collusive efforts became apparent through multiple subpoenas issued in connection with civil and criminal antitrust investigations.  ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

    **1.**   ████████████████████████████

    140.   ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

    141.   ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



144.    As the CTAG's investigation advanced, the DOJ commenced its own criminal investigation into generic drug pricing, prompted by the release of a report published by the NCPA, which found price increases of generic drugs ranging from 600-1000% or more. A grand jury convened by the DOJ issued a subpoena to Lannett, and later to Lannett's competitors, relating to the "DOJ's continuing federal investigation of the generic pharmaceutical industry

into possible violations of the Sherman Act," requesting Lannett's corporate documents relating to the pricing of certain generic medications.   Thereafter, on December 8, 2014, Lannett disclosed in a SEC Form 8-K that the Company had been served with a federal grand jury subpoena on December 5, 2014 directed at certain executives and relating to the continued "investigation of the generic pharmaceutical industry [and] possible violations of the Sherman Act."

145. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████

146. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███

147. 

148. Thus,

3.

149.    As set forth in detail above, members of Congress have initiated a bipartisan investigation into the underlying reasons for the skyrocketing prices of generic pharmaceuticals. In an effort to understand the causes of soaring generic drug prices, on October 2, 2014, Representative Elijah E. Cummings and Senator Bernie Sanders sent the Congressional Letter to Defendant Bedrosian, informing him of the congressional investigation "into the recent staggering price increases for generic drugs used to treat everything from common medical conditions to life-threatening illnesses." The Congressional Letter requested documents relating to Digoxin and Doxycycline Hyclate and included inquiry into the Company's revenue, purchase

price, total sales, cost of manufacturing, purchase agreements, valuation of financial and non-

financial factors, cost estimates, and profit projections. The Congressional Letter stated, in

relevant part:

> We are writing to your company to ***request information about the escalating
> prices it has been charging for two drugs: Digoxin and Doxycycline Hyclate***,
> which are used to treat certain types of irregular heartbeats and heart failure, and
> to treat a variety of infections, respectively. According to data provided by the
> Healthcare Supply Chain Association (HSCA), ***the average price charged for this
> drug has increased by as much as 8281 percent from October 2013 to April
> 2014. Over that time period, the average market price went up by as much as
> $1,829.*** Additionally, according to National Average Drug Acquisition Cost Data
> provided by HSCA, ***the average price charged for Digoxin has increased by as
> much as 884 percent from October 2012 to June 2014.***

[Emphasis added.]

150.



151.    The Senate Committee conducted a series of hearings, one of which took place on

November 20, 2014,

Although Defendant Bedrosian was invited to attend, he did

not testify. Instead, Defendant Bedrosian attended a healthcare conference on December 8,

2014, similar to ones the Company allegedly used to coordinate price-fixing in the past, to mock

the regulators' inquiry, stating during his presentation: "The Connecticut Attorney General

decided to investigate the price increases, assuming . . . that we meet in hotel rooms with competitors and do things like that, which is nonsensical[.]"

4. ████████████████████████████████████████████

152.   In 2015 and 2016, numerous lawsuits were filed against Lannett and its competitors, alleging price-fixing and the collusive division of markets and customers, stemming from the governmental investigations into anticompetitive conduct in the generic pharmaceutical industry.   These lawsuits, which were consolidated for pretrial purposes into a multidistrict litigation in 2017, assert claims for price fixing of generic drugs in violation of the Sherman Act and/or state antitrust law and allege that generic drug companies, including Lannett, have effectuated the alleged conspiracy through direct company-to-company contacts and joint activities undertaken through trade associations, and in particular, meetings of the GPhA.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

B. ████████████████████████████████████████

153. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

154.

155.

156.



157.

158.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████

159.    Additionally, ██████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

160.    ████████████████████████████████████

███████████████████████████████████████████

█████████████



## VIII.  DAMAGES TO THE COMPANY

161.    As a result of the Individual Defendants' knowing misconduct, Lannett engaged in a deceptive, fraudulent, and illegal scheme to fix the prices of certain of its generic drugs in order to enhance its revenue and attain funding for its expansionist business strategy. Lannett's conduct violated federal and state antitrust laws and securities fraud laws and operated to the detriment of the Company, consumers, and the public at large. The DOJ has brought criminal charges against other executives party to the conspiracy and severe monetary penalties and other forms of sanctions could result due to Lannett's illegal price-fixing scheme.

162.    Further, as a direct and proximate result of the Individual Defendants' actions, Lannett has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

> a.    costs incurred from defending, settling, or paying an adverse judgment in the DOJ Probe, State AG Action, Antitrust Action, and/or Securities Action;
>
> b.    costs incurred from implementing any corrective and/or remedial measures ordered by state and federal authorities or agreed to by virtue of a settlement or a compromise;
>
> c.    costs incurred from defending, settling, or paying any adverse judgment from any other legal actions pertaining to Lannett's practices relating to the imposition of APIs and/or other of its unlawful business practices; and
>
> d.    costs incurred from the compensation and benefits paid to the Individual Defendants who have breached their fiduciary duties to Lannett.

163.    Finally, Lannett's business, goodwill, and reputation have been, and will continue to be, severely damaged by the Individual Defendants' decision to allow and/or failure to prevent the Company's systemic violation of state and federal laws.

## IX.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

### A.    Demand on the Board Is Futile

164.    Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants.   Any such demand would be futile and useless because the Board (comprised of Director Defendants Farber, Drabik, Taveira, Maher, and Paonessa and non-parties Timothy C. Crew, Patrick G. LePore, and John C. Chapman) is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

165.    *First*, the Director Defendants had fiduciary obligations to ensure that Lannett complied with antitrust laws that they knowingly failed to fulfill.    ██████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████    Based on the facts alleged herein, there is a substantial likelihood that Plaintiff will be able to prove that these five individuals breached their fiduciary duties by condoning the misconduct and failing to take any meaningful action to remedy the resultant harm.

166.    *Second*, the Director Defendants breached their fiduciary duties by failing to carry out. in good faith. the very responsibilities that Lannett's own corporate governance policies imposed on them.   Specifically, the Company's Governance Guidelines charged all members of the Board with the responsibility of "reviewing the major risks facing the Company and helping develop strategies to address these risks, and establishing policies designed to maintain the financial, legal and ethical integrity of the Company."   ██████████████████████████

167.   Furthermore, ██████████████████████████████████████████

168.   The enforcement action brought by the 46 state attorneys general and District of Columbia – alleging that Lannett engaged in a widespread conspiracy to fix, maintain, and control the price of Digoxin and allocated customers or territories relating to its sales – ████████

169.    The private antitrust litigation spurred by the DOJ Probe and State AG Action

170.

[redacted]

**B.    Demand on Defendants Farber, Maher, Taveira, and Drabik Is Futile Due to Their Insider Sales**

171.    While aware of the illegal conspiracy to fix the price of generic drugs and to allocate territories and products in violation of state and federal antitrust laws, Defendants Farber, Maher, Taveira, and Drabik made large stock sales of their personally held Lannett stock, taking advantage of the Company's artificially inflated share price.  As shown in table below, from mid-2014 through 2017, Director Defendants Farber, Maher, Taveira, and Drabik and ex-CEO Defendant Bedrosian collectively sold over 150,000 shares for proceeds of over $5 million.

| Defendant | Officer/Director | Number of Shares | Total Value Traded |
|---|---|---|---|
| Jeffrey Farber | Director | 40,000 | $2,158,600 |
| James M. Maher | Director | 1,478 | $50,119 |
| Paul Taveira | Director | 3,500 | $204,615 |
| David Drabik | Director | 12,500 | $769,375 |
| Arthur Bedrosian | then-CEO | 100,000 | $2,611,400 |

172.    Defendants Farber, Maher, Taveira, and Drabik, therefore, personally benefited from Lannett's participation in the illegal price fixing conspiracy, and the lies that Lannett's executives told the Company' shareholders.  As such, demand upon them would be futile.

72

C.     Demand on Defendants Maher, Drabik, and Taveira Is Futile Due to Their
       Positions on the Audit Committee

173.     Defendants Maher, Drabik, and Taveira lack the requisite level of independence
necessary to weigh the merits of this litigation, having served as members of the Audit
Committee at all relevant times.  Pursuant to the Audit Charter, Defendants Maher, Drabik, and
Taveira were obligated to "receive and review . . . the Company's financial statements prior to
the[ir] filing," which "should include a discussion of *critical accounting policies* (and changes
therein, if any) of the Company, including any financial reporting matters which could have a
material impact on the Company's financial statements[.]"  [Emphasis added.]  Additionally, it
was the responsibility of the Audit Committee members to: (i) "discuss the Company's
significant enterprise risks and the procedures Management has developed to monitor, manage
and mitigate such exposures"; (ii) "periodically review Management's processes for monitoring
compliance with legal and regulatory requirements"; and (iii) "review with Management and
legal counsel any significant legal or compliance matters, including the status of pending
litigation that may have a material impact on the Company and any material reports or inquiries
from regulatory or governmental agencies."

174.     As alleged herein, the Audit Committee failed to adequately monitor the
Company's compliance and disclosure controls to ensure that it complied with state and federal
law and regulation.  For example, as evidenced by the enforcement action lead by the CTAG, the
DOJ criminal investigation and indictments, and the dozens of antitrust and securities class
actions filed against Lannett, the Company failed to maintain processes and procedures for
monitoring compliance and regulatory requirements to prevent exposure to risks of reputational
and monetary harm.  Had Defendants Maher, Drabik, and Taveira established procedures for
overseeing and monitoring the Company's antitrust compliance and risk disclosures compliance,

73

as they were required to do pursuant to the Audit Charter, they could have prevented the illegal price-fixing scheme and aggressive expansionist business plan based on such illegal price-fixing before the Company, defenseless at the hands of the Individual Defendants, made this illegal conduct the central pillar of the Company's profitability.

175.    Neither did the allegations in the regulatory actions motivate Defendants Maher, Drabik, and Taveira to investigate the Company's internal compliance programs, policies, and procedures, even after the DOJ signaled its intention to press criminal charges against individuals involved in the illegal conspiracy, and even after a multidistrict litigation had been formed to encompass hundreds of lawsuits regarding price-fixing in the generic drug industry.  Indeed, Defendants Maher, Drabik, and Taveira did not implement or recommend the implementation of *any* policies that would save Lannett the marketing and reputational damage and significant organizational resources expended in defending, settling, or otherwise dealing with the mounting number of legal challenges brought against the Company by private litigants and regulators. Accordingly, demand on Defendants Maher, Drabik, and Taveira is futile.

### D.    Demand on Defendants Drabik, Taveira, and Maher Is Futile Due to Their Positions on Governance and Nominating Committee

176.    Defendants Drabik, Taveira, and Maher lack the requisite level of independence necessary to weigh the merits of this litigation, having served as members of the Governance and Nominating Committee.  Pursuant to the G&N Charter, Defendants Drabik, Taveira, and Maher were charged with: "develop[ing] the criteria and qualifications required for director candidates"; "[i]dentifying individuals qualified to become board members consistent with criteria approved by the Board"; and "recommending to the Board director nominees to be presented for election at the Annual Meeting or for filling vacancies on the Board."  To discharge their responsibilities as set forth above, Defendant Drabik, Taveira, and Maher were required to "perform a ***robust***

*review* [including] collection of outside information[,] . . . publicly available information and all other relevant information available to determine if the person should be considered further." [Emphasis added.]

177.    As alleged herein, and in direct contravention of the responsibilities vested in them in the G&N Charter, Defendants Drabik, Taveira, and Maher nominated and approved for Board membership individuals who did not possess the minimum qualifications to serve as directors due to their own conflicted positions and a lack of commitment to act in furtherance of shareholder interest.  For example, Defendants Drabik, Taveira, and Maher recommended the same Board members for nomination for elections, year-after-year, notwithstanding the investigations of the obvious price-fixing the Company employed for certain key drugs and extensive number of private lawsuits seeking to recover for such illegal anti-competitive conduct.    Had Defendants Drabik, Taveira, and Maher fulfilled their responsibilities of performing a "robust review" of potential nominees and making recommendations to the Board based on meritorious review of the nominees' qualifications, as they were required to pursuant to the G&N Charter, they would have recommended individuals for nominations whose interests were aligned with the interests of Lannett's shareholders and would thereby contribute to the Company's operational and financial well-being.  Instead, Defendants Drabik, Taveira, and Maher failed to take any action whatsoever to vet potential nominees, or investigate actual wrongdoing committed by their nominees, and instead, rubber stamped and selfishly recommended themselves for positions that they did not qualify for.  Accordingly, demand on Defendants Drabik, Taveira, and Maher is futile.

### E.   Demand on Defendants Farber, Drabik, and Paonessa Is Futile Due to Their Positions on the Strategic and Planning Committee

178.   Defendants Farber, Drabik, and Paonessa lack the requisite level of independence necessary to weigh the merits of this litigation, having served as members of the Strategic Planning Committee.  Pursuant to the Strategic Planning Charter, Defendants Farber, Drabik, and Paonessa were responsible for, amongst other things: "[d]eveloping criteria for use in evaluating potential strategic investments"; "[a]ssisting management to identify critical strategic issues facing the organization"; and "[a]ssessing potential mergers and acquisitions."  To fulfill these responsibilities, Defendants Farber, Drabik, and Paonessa were required to "assist management in developing and refining a strategic plan which identifies specific long-term goals and business objectives determined to be in the Company's best interest."

179.   Defendants Farber, Drabik, and Paonessa failed to fulfill these obligations by failing to act upon learning of Lannett's participation in a price-fixing conspiracy, despite being tasked with identifying "strategic issues facing the organization," while having knowledge of the civil investigation by 46 state attorneys general, the criminal investigation by the DOJ, and the congressional inquiry, all relating to the same underlying misconduct – Lannett's participation in the price-fixing conspiracy in the generic pharmaceutical market.   Neither did Defendants Farber, Drabik, and Paonessa take any action to alert the organization of a "strategic issue" when over 100 private antitrust lawsuits were filed against Lannett, claiming substantially the same violations of the federal and state antitrust laws.  Instead, Defendants Farber, Drabik, and Paonessa failed to take any action whatsoever to investigate Lannett's unprecedented pricing increases and obvious price-fixing as one of the strategic issues facing the organization. Accordingly, demand on Defendants Farber, Drabik, and Paonessa is futile.

180.     Thus, Defendants Farber, Drabik, Taveira, Maher, and Paonessa have entirely abdicated their responsibility to ensure that Lannett complied with the applicable federal and state laws and regulations and that the disclosures made to the investing public were accurate and complete.  As such, Defendants Farber, Drabik, Taveira, Maher, and Paonessa lack the requisite level of independence needed to consider demand.

## X.     INSIDER TRADING ALLEGATIONS

181.     From mid-2014 through 2017, the Insider Trading Defendants collectively sold over 150,000 shares of Lannett common stock while in possession of material non-public information.  These sales placed the Insider Trading Defendants' shares into the open market at fraudulently inflated prices at a time that the Lannett Board was causing the Company to participate in an industry-wide conspiracy to fix the price of generic drugs in violation of federal and state laws and regulations.

182.     The Insider Trading Defendants knew that Lannett was engaged in a widespread illegal scheme by entering into anticompetitive agreements with competitors with the goal of fixing prices for generic drug products constituting a majority of the Company's revenues and maintaining predetermined market share at these artificially inflated levels, which conspiracy Lannett and others effectuated through the exchange of non-public information during frequent meetings at industry conferences, professional business dinners, and other social events. Consequently, the Insider Trading Defendants were in possession of material non-public information and were prohibited from trading Company stock until such information was revealed to the public.

183.     The following chart summarizes the dates upon which Defendant Farber traded, as well as the proceeds from such trades:

**Defendant Farber**

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 02/05/2016 | 5,000 | $24.48 | $122,400 |
| 2/12/2015 | 35,000 | $58.18 | $2,036,200 |
| | Total Proceeds: | | $2,158,600 |

184.    Defendant Farber's sales were inconsistent with past trading patterns and suspicious in their timing and amount. Defendant Farber sold his shares, placing them into the open market at fraud-inflated prices, at a time that he knew the Company was carrying out an expansionist business plan premised on revenues generated through anticompetitive agreements with competitors entered into with the goal of fixing prices for generic drug products, constituting a majority of the Company's revenues and maintaining predetermined market share at these artificially inflated levels, in violation of federal and state law.

185.    The following chart summarizes the dates upon which Defendant Taveira traded, as well as the proceeds from such trades:

**Defendant Taveira**

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 3/6/2015 | 2,500 | $63.07 | $157,675 |
| 6/16/2014 | 1,000 | $46.94 | $46,940 |
| | Total Proceeds: | | $204,615 |

186.    Defendant Taviera's sales were inconsistent with past trading patterns and suspicious in their timing and amount. Defendant Taveira sold his shares, placing them into the open market at fraud-inflated prices, at a time that he knew the Company was carrying out an expansionist business plan premised on revenues generated through anticompetitive agreements with competitors entered into with the goal of fixing prices for generic drug products,

constituting a majority of the Company's revenues and maintaining predetermined market share at these artificially inflated levels, in violation of federal and state law.

187.     The following chart summarizes the dates upon which Defendant Drabik traded, as well as the proceeds from such trades:

**Defendant Drabik**

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 2/18/2015 | 12,500 | $61.55 | 769,375 |
| | | **Total Proceeds:** | **$769,375** |

188.     Defendant Drabik's sales were inconsistent with past trading patterns and suspicious in their timing and amount. Defendant Drabik sold his shares, placing them into the open market at fraud-inflated prices, at a time that he knew the Company was carrying out an expansionist business plan premised on revenues generated through anticompetitive agreements with competitors entered into with the goal of fixing prices for generic drug products, constituting a majority of the Company's revenues and maintaining predetermined market share at these artificially inflated levels, in violation of federal and state law.

189.     The following chart summarizes the dates upon which Defendant Maher traded, as well as the proceeds from such trades:

**Defendant Maher**

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 09/01/2016 | 1,478 | $33.91 | $50,119 |
| | | **Total Proceeds:** | **$50,119** |

190.     Defendant Maher's sales were inconsistent with past trading patterns and suspicious in their timing and amount. Defendant Maher sold his shares, placing them into the open market at fraud-inflated prices, at a time that he knew the Company was carrying out an expansionist business plan premised on revenues generated through anticompetitive agreements

with competitors entered into with the goal of fixing prices for generic drug products, constituting a majority of the Company's revenues and maintaining predetermined market share at these artificially inflated levels, in violation of federal and state law.

191.    The following chart summarizes the dates upon which Defendant Bedrosian traded, as well as the proceeds from such trades:

**Defendant Bedrosian**

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 11/22/2017 | 92,578 | $26.19 | $2,424,366 |
| 11/8/2017 | 7,422 | $25.20 | $187,034 |
| Total Proceeds: | | | $2,611,400 |

192.    Defendant Bedrosian's sales were inconsistent with past trading patterns and suspicious in their timing and amount. Defendant Bedrosian sold his shares, placing them into the open market at fraud-inflated prices, at a time that he knew the Company was carrying out an expansionist business plan premised on revenues generated through anticompetitive agreements with competitors entered into with the goal of fixing prices for generic drug products, constituting a majority of the Company's revenues and maintaining predetermined market share at these artificially inflated levels, in violation of federal and state law.

## XI.   CAUSES OF ACTION

### COUNT I

### For Breach of Fiduciary Duty
### (Against All of the Individual Defendants)

193.    Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.

194.    The Individual Defendants owed, and owe, Lannett the highest fiduciary obligations of good faith, fair dealing, loyalty, and due care in managing the Company's affairs.

80

195.    The Individual Defendants, individually and collectively, violated and breached their fiduciary by:

a.    failing to ensure that Lannett, and its directors and officers, complied with federal laws; and

b.    failing to conduct an adequate investigation of known potential (and/or actual) violations of federal laws.

196.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Lannett has sustained significant damages – both financially and to its corporate image and goodwill.  Such damages include, among other things, the cost of defending Lannett in the Antitrust Action, Securities Action, State AG Action, and DOJ Probe, including the costs associated with any settlements thereof.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

197.    Plaintiff, on behalf of Lannett, has no adequate remedy at law.

## COUNT II

### Violations of Section 10(b) of the Exchange Act
### (Against the Individual Defendants)

198.    Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.

199.    During the Relevant Period, the Individual Defendants disseminated or approved public statements that failed to fully disclose the fact that Lannett was systematically violating federal and state law by: (i) engaging in a widespread conspiracy to fix the prices of generic drugs; (ii) basing their pricing strategies on artificially elevated prices of generic medication; and (iii) making misrepresentations to the investing public regarding its revenue source, generic competition, and compliance with the laws and regulations.

200.    As such, the Individual Defendants caused the Company to violate §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they:

      a.    employed devices, schemes, and artifices to defraud; and

      b.    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

201.    As a result of the Individual Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace as a result of the violations of §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

202.    At all relevant times to the dissemination of the materially false and/or misleading Proxy Statements, Director Defendants were aware of, and/or had access to, the true facts concerning Lannett's operation.

203.    Lannett has been severely injured by this conduct and is entitled to damages and equitable relief.

## COUNT III

### Violation of Section 14(a) of the Exchange Act
### (Against the Individual Defendants)

204.    Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.

205.    SEC Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. §240.14a-9(a).

206.    The Individual Defendants exercised control over Lannett and caused the Company to disseminate the false and misleading Proxy Statements.  The Proxy Statements materially misrepresented the effectiveness of the Board's oversight of internal controls at Lannett, the Board's compliance with Lannett's corporate governance documents, and the process and qualification of selecting nominees for election to the Board.

207.    As stated herein, the Proxy Statements contained untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  These false statements and omissions were essential links in the election of certain of the Director Defendants to Lannett's Board and the continued illegal management of Lannett.

208.    The written communications made by the Individual Defendants, as described herein, constitute violations of Rule 14a-9 and §14(a) because such communications were materially false and/or misleading and were provided in a negligent manner.

209.    At all relevant times to the dissemination of the materially false and/or misleading Proxy Statements, Director Defendants were aware of, and/or had access to, the true facts concerning Lannett's operation.

210.    Lannett has been severely injured by this conduct and is entitled to damages and equitable relief.

## COUNT IV

### Violation of Section 29(b) of the Exchange Act
### (Against the Individual Defendants)

211.    Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.

212. Individual Defendants each received incentive compensation and fees, including stock awards, while engaging in conduct that violates §§10(b) and 14(a) of the Exchange Act. The Individual Defendants' incentive compensation and fees should be rescinded under §29(b) of the Exchange Act because Individual Defendants violated §§10(b) and 14(a) of the Exchange Act by issuing false and misleading reports to Lannett's shareholders regarding the nature of, and responsibility for, the Company's internal controls and operations. All of the payments Individual Defendants received are, therefore, voidable by Lannett.

213. Lannett is in privity with the Individual Defendants with respect to the incentive compensation and fees provided by Lannett to Individual Defendants. Individual Defendants have engaged in prohibited conduct in violation of the securities laws, as alleged herein.

214. Lannett has been severely injured by the misconduct of the Individual Defendants. Accordingly, Lannett is entitled to damages, *i.e.*, recession of the incentive and compensation and fees granted to Individual Defendants.

## COUNT V

### Breach of Fiduciary Duty for Insider Trading
### (Against the Insider Trading Defendants)

215. Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.

216. At the time of the stock sales set forth herein, the Insider Trading Defendants knew the material non-public information described above and sold Lannett common stock on the basis of such information.

217. The information described above was proprietary non-public information concerning the Company's operation, financial condition, and future business prospects. It was a

84

proprietary asset belonging to the Company, which the Insider Trading Defendants used for their own benefit when they sold their Lannett common stock.

218.    At the time of their stock sales, the Insider Trading Defendants knew and/or were engaging in a scheme to cause the Company to commit to a business plan premised on a widespread price-fixing conspiracy violative of federal and state law.    The Insider Trading Defendants' sales of Lannett stock, while in possession and control of this material adverse non-public information, was a breach of their fiduciary duties of loyalty and good faith, and the concealment of this material non-public information allowed the Insider Trading Defendants to knowingly sell their shares at artificially inflated prices.

219.    As a direct and proximate result of the Insider Trading Defendants' insider sales and breach of fiduciary duties, Lannett has suffered damages, not only monetarily, but also to its corporate image and goodwill.    Because the Insider Trading Defendants used the Company's proprietary information for their own gain, the Company is entitled to the imposition of a constructive trust on any profits the Insider Trading Defendants obtained thereby.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in Lannett's favor against the Individual Defendants as follows:

A.    Declaring that this action is a proper derivative action, Plaintiff is an adequate representative on Lannett's behalf, and demand is excused;

B.    Declaring that the Individual Defendants have breached their fiduciary duties owed to Lannett and its shareholders;

C.    Awarding Lannett the damages it sustained due to the violations alleged herein from each of the Individual Defendants, jointly and severally, together with interest thereon;

85

D.     Awarding to Lannett restitution from the Individual Defendants and ordering disgorgement of all unlawfully obtained profits, benefits, and other compensation obtained by the Individual Defendants;

E.     Directing Lannett to take all necessary actions to reform and improve its corporate governance and internal procedures, comply with the Company's existing governance obligations and all applicable laws, and protect the Company and its shareholders from a recurrence of the damaging events described herein;

F.     Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court deems just and proper.

## XIII.   JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  July 20, 2018                     **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

                                           */s/ Jonathan M. Zimmerman*
                                          Jonathan M. Zimmerman (PA 322668)
                                          Scott Jacobsen
                                          The Helmsley Building
                                          230 Park Avenue, 17th Floor
                                          New York, NY 10169
                                          Telephone:  (212) 223-6444
                                          Facsimile:   (212) 223-6334
                                          jzimmerman@scott-scott.com
                                          sjacobsen@scott-scott.com

                                          Geoffrey M. Johnson
                                          **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
                                          12434 Cedar Road, Suite 12
                                          Cleveland Heights, OH 44106
                                          Telephone:  (216) 229-6088
                                          Facsimile:   (860) 537-4432
                                          gjohnson@scott-scott.com

                                          Amber L. Eck
                                          **HAEGGQUIST & ECK, LLP**
                                          225 Broadway, Suite 2050

86

San Diego, CA 92101
Telephone: (619) 342-8000
Facsimile: (619) 342-7878
ambere@haelaw.com

*Attorneys for Plaintiff Edward Shamoon*

## VERIFICATION OF EDWARD SHAMOON

I, Edward Shamoon, make this Declaration, and, being duly sworn, depose and say:

I am the derivative plaintiff in this action. I verify that I have reviewed the Verified Shareholder Derivative Complaint (the "Complaint") to be filed in this action and that the facts stated in the Complaint, as they concern myself, are true to my personal knowledge. I believe the facts pleaded in the Complaint on information and belief or investigation of counsel are true.

I have not received, been promised or offered, and will not accept, any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except (i) such fees, costs or other payments as the Court expressly approves to be paid to me, or (ii) reimbursement, by my attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

Dated: 7/18/8

_____
Edward Shamoon

Sworn to and subscribed before me this 18ᵗʰ day of July, 2018.

See Attached
NOTARY PUBLIC

My commission expires:

1/8/21

**CALIFORNIA JURAT WITH AFFIANT STATEMENT**          GOVERNMENT CODE § 8202

□ See Attached Document (Notary to cross out lines 1–6 below)
□ See Statement Below (Lines 1–6 to be completed only by document signer[s], not Notary)

.

_____          _____
  *Signature of Document Signer No. 1*          *Signature of Document Signer No. 2 (if any)*

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document
to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document

State of California                              Subscribed and sworn to (or affirmed) before me

County of _Los Angeles_                          on this __18th__ day of __July__ , 20 _18_
                                                 by   *Date*          *Month*          *Year*
                                                 (1) _Edward Shamoun_ ___ _ _

                                                 (and (2) _____  _____ . __ )
                     ROBIN GUBIN                                *Name(s) of Signer(s)*
                 Notary Public – California
                     Ventura County
                 Commission # 2179516           proved to me on the basis of satisfactory evidence to
             My Comm. Expires Jan 13, 2021       be the person(s) who appeared before me

                                                 Signature _____
     *Place Notary Seal and/or Stamp Above*                  *Signature of Notary Public*

————————————————— **OPTIONAL** —————————————————

          *Completing this information can deter alteration of the document or*
          *fraudulent reattachment of this form to an unintended document*

**Description of Attached Document**

Title or Type of Document _Urrification of Edward Shamoun_

Document Date __7/8/18__ _____ _ Number of Pages __1__

Signer(s) Other Than Named Above _____

©2017 National Notary Association

M1304-08 (09/17)